**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| POTTSTOWN SCHOOL DISTRICT | : | No. 95 MAP 2023 |
| | : | |
| | : | Appeal from the February 10, 2023 |
| v. | : | Order of the Commonwealth Court at |
| | : | No. 1217 CD 2021 reversing the |
| | : | October 8, 2021 Order of the |
| MONTGOMERY COUNTY BOARD OF | : | Montgomery County Court of |
| ASSESSMENT APPEALS, POTTSTOWN | : | Common Pleas, Civil Division, at |
| HOSPITAL, LLC, POTTSTOWN | : | Nos. 2017-27756, 2017-27758, and |
| BOROUGH AND COUNTY OF | : | 2017-27783. |
| MONTGOMERY | : | |
| | : | ARGUED:  September 10, 2024 |
| | : | |
| APPEAL OF: POTTSTOWN HOSPITAL, | : | |
| LLC | : | |

## OPINION

**CHIEF JUSTICE TODD**                                    **DECIDED:  May 30, 2025**

In this appeal by allowance, we consider whether Appellant Pottstown Hospital, LLC ("Hospital") was operating entirely free from profit motive, so as to qualify as a purely public charity under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution, and therefore was entitled to claim an exemption from local property taxation for certain tax years pursuant to our decision in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985) ("*HUP*").  In deciding this issue, we consider the relevancy of the relationship between the Hospital and Tower Health LLC ("Tower Health"), a non-profit corporation that was the sole managing member of the Hospital, and the amount of the Hospital's executive compensation.  Because we conclude that the Hospital was entitled

to the tax exemption, we reverse the order of the Commonwealth Court, which had reversed the trial court's order granting the exemption.

## I. Background and Procedural History

In 2017, Reading Health System, transformed into Tower Health after purchasing five hospital facilities in Montgomery and Chester Counties from Community Health Systems, Inc. — a for-profit entity. One of the hospital facilities Tower Health acquired was Pottstown Hospital situated in Montgomery County. The Pottstown hospital facility is a community acute care hospital furnishing a range of health services to the public, including emergency, inpatient, and outpatient care, as well as diagnostic and surgical procedures; it also engages in community outreach efforts and clinical research, and it trains medical residents. *Pottstown School District v. Montgomery County Board of Assessment Appeals*, 289 A.3d 1142, 1144 (Pa. Cmwlth. 2023); Trial Court Opinion, 2/23/22, at 4.

After the purchase of the hospital facilities, Tower Health, which is classified as a federal non-profit corporation under 25 U.S.C. § 501(c)(3), created separate non-profit limited liability companies ("LLC") to run each of the acquired facilities. The Hospital was formed by Tower Health for the purpose of operating the Pottstown hospital facility, and Tower Health is the sole member of this non-profit LLC. *Pottstown*, 289 A.3d at 1144.[1]

The relationship between the Hospital and Tower Health is now governed by an operating agreement, which provides that the Hospital is managed by an unpaid board of trustees with certain powers being reserved thereunder to Tower Health as its sole member. *See* Operating Agreement, § 3.1 (R.R. at 848-849a)[2]; Trial Court Opinion,

---

[1] The Commonwealth Court concluded that this LLC structure renders Pottstown Hospital, LLC a "member-managed LLC," under Sections 8847(a) and (b) of the Pennsylvania Uniform Limited Liability Company Act of 2016, 15 Pa.C.S. §§ 8891-8898. *Pottstown*, 289 A.3d at 1149. The parties presently do not dispute that tribunal's conclusion.

[2] R.R. refers to the Reproduced Record filed with our Court in this matter.

10/8/21, at 4.   The Hospital and Tower Health both maintain separate executive management groups, with day-to-day operational management of the Hospital facility's activities being the responsibility of executives employed by the Hospital.

As is relevant to the issues presented by this appeal, the compensation of the members of the executive management groups for both Tower Health and the Hospital is approved annually by an Executive Compensation Committee of the Tower Health Board of Directors ("Compensation Committee"), in consultation with a private executive compensation consulting firm.   Additionally, Tower Health charges the Hospital a yearly fee for provision of "administrative and management" services.  *Pottstown*, 289 A.3d at 1154.

In 2017, the Hospital filed an application with the Montgomery County Board of Assessment Appeals for charitable real estate tax exemptions for three of its properties: the main hospital building and campus; a medical office building, 66% of which was occupied by the Hospital's employees; and a building which housed the Hospital's occupational services.  Trial Court Opinion, 10/6/21, at 2.

As this case involves the question of whether the Hospital qualifies as an institution of purely public charity under Article VIII, Section 2(a)(v)[3] of our Commonwealth's Constitution, it is helpful to briefly consider the historical evolution of the manner in which charitable hospitals deliver medical care to our communities, as well our Court's

---

[3]  Section 2(a) states, in relevant part:
> The General Assembly may by law exempt from taxation:
> * * *
> (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

Pa. Const. art. VIII, § 2(a)(v).

interpretation of this constitutional provision in determining whether a particular entity is entitled to claim its exemption from taxation.

As contemporary scholars have observed, "[t]he modern nonprofit or voluntary hospital has its roots in nineteenth-century organizations founded to care exclusively for the indigent sick. These alms houses, built with privately donated capital and/or public funds, were staffed by nurses, often members of religious communities, and doctors who donated their services." Alice A. Noble, Andrew L. Hyams, Nancy M. Kane, *Charitable Hospital Accountability: A Review and Analysis of Legal and Policy Initiatives*, 26 J.L. Med. & Ethics 116 (1998) (hereinafter, "Noble"). Pennsylvania's historical experience with charitable hospitals likewise reflected their intended roles as beneficent providers of healing care to all who were in need of it, regardless of financial means. Indeed, Benjamin Franklin and Dr. Thomas Bond founded "The Pennsylvania Hospital" in 1753, which was the first institution of its kind in the English colonies, and it operated in accordance with these guiding principles. Daniel G. Bird, Eric J. Maier, *Wayward Samaritans: "Nonprofit" Hospitals and Their Tax-Exempt Status*, 85 U. Pitt. L. Rev. 81, 84 (2023) (hereinafter, "Bird"). Consistent therewith, "the hospital's volunteer staff provided care to the sick and destitute at no cost, their good works paid for by donations and public funds." *Id*. Most other early American hospitals were operated in the same manner. *Id.* Correspondingly, in recognition of the charitable works performed within their walls, and the fact that they provided services to the public which governments did not at the time, such charitable hospitals were routinely exempted from all manner of state and local taxes. *Id.*

However, since the late 1930s, "advances in medical technology and the curative power of medicine, coupled with the widespread availability of health insurance and federally subsidized debt programs, transformed the hospital industry into a multibillion dollar market that sells most of its services to paying patients in institutions financed by

borrowed capital and internally generated earnings." Noble at 117. Thus, these factors, along with changes in the fundamental role of hospitals in the overall patient treatment process which have shifted many formerly hospital-based services to ambulatory clinics, or home-based care, have most recently spurred waves of hospital mergers and consolidations. As a result, today, most hospitals, including tax-exempt hospitals, are not wholly independent entities, but instead are now part of multibillion-dollar health systems. Bird at 84.

Correspondingly, a modern hospital executive today is more likely to oversee a multifaceted healthcare delivery system, and his or her compensation has taken on aspects of the compensation provided to executives of for-profit corporations. Noble at 117. Moreover, relaxation of the IRS guidelines for executive compensation by tax-exempt organizations has led non-profit hospitals to offer profit-sharing incentives to their top executives, such as the one at issue in the present case. *Id.* As a general matter, such incentive plans are regarded by the IRS as consistent with the tax-exempt status of the hospital "as long as the total compensation is 'reasonable' in relation to the services rendered." *Id.*

In our Commonwealth, the taxation of charitable entities such as hospitals has also undergone an evolutionary process over time. From the late 1700s to the mid-1800s, the legislature had unfettered discretion to exempt any property from taxation which was used for what it alone adjudged to be a charitable purpose; however, as is the nature of such an unconstrained power, its indiscriminate wielding inevitably resulted in great abuses in the conferral of tax-exempt status on entities that fulfilled no demonstrable charitable purpose. *See Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Board of Assessment Appeals*, 44 A.3d 3, 8 (Pa. 2012) ("Prior to the 1874 Constitution, the legislature, by special act, relieved from taxation just what property it saw fit, whether the property was

charitable, religious, or even devoted solely to purposes of corporate or private gain. The legislative habit had grown into a great abuse." (citation and quotation marks omitted)). As a result of widespread disdain over these corrupt practices, which benefitted the select few at the expense of the general welfare of the public as a whole, the framers of our Commonwealth's 1874 "Reform Constitution" deliberately crafted the language currently contained in Article VIII, Section 2(a)(v) "to restrict exemption from taxation within much narrower limits, and thus remedy, to some extent, what had become a great evil." *Chadwick v. Maginnes*, 94 Pa. 117 (Pa. 1880).[4] The people of our Commonwealth overwhelmingly voted, first in 1874 and again in 1968, to include the present language of Article VIII, 2(a)(v) in our organic charter so as "to destroy the obnoxious feature of favoritism by special legislation." *Mesivtah Eitz Chaim of Bobov*, 44 A.3d at 8.

Our Court has interpreted this constitutional provision to require an entity claiming the status of a purely public charity to demonstrate that it:

> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and
>
> (e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317.[5]

---

[4] In the Constitution of 1874, this language was contained in Article I, Section 9. *Appeal of Donohugh*, 86 Pa. 306 (Pa. 1878). The 1968 Constitution moved it to its current location in Article VIII, Section 2.

[5] Subsequent to our *HUP* decision, the General Assembly enacted Act 55 of 1997, the Institutions of Purely Public Charity Act, 10 P.S. §§ 371–385, which established statutory criteria for an organization to meet in order to qualify for a charitable tax exemption. Thereafter, in *Mesivtah Eitz Chaim of Bobov, Inc.*, our Court held that the passage of this
(continued…)

In the present case, on October 31, 2017, the Montgomery County Board of Assessment Appeals granted charitable real estate tax exemptions for the Hospital's three properties, effective January 1, 2018. Appellee in this matter, the Pottstown School District ("School District"), appealed each exemption to the Montgomery County Court of Common Pleas, contending, *inter alia*, that: (1) the fifth *HUP* requirement − that the Hospital operate entirely free from private profit motive − was not satisfied due to unreasonably high executive compensation and the extent to which the executives' incentive pay was tied to the Hospital's financial performance; and (2) the Hospital failed to prove its entitlement to the tax exemption because the relevant operating entity is not the Hospital, but rather Tower Health.

The matter was assigned to the Honorable Jeffrey S. Saltz, who consolidated the appeals and conducted a nonjury trial in June 2021, after which he authored two comprehensive and well-written opinions thoroughly describing the voluminous evidence he had received, as well as his application of the relevant legal principles which we discuss at greater length *infra*. At trial, the parties presented evidence that Tower Health exercises significant control over the Hospital's finances, inasmuch as the operating agreement between the two entities reserves to Tower Health the power to set the operating and capital budgets for the Hospital, and, accordingly, Tower Health has the

_____

legislation did not supplant the *HUP* test for establishing the criteria under the Pennsylvania Constitution for whether an entity meets the definition of a purely public charity set forth in Article VIII, Section 2. Thus, we therein reaffirmed the principle that any entity seeking tax-exempt status must first meet the requirements of *HUP,* as they are the minimum standards which establish compliance with this constitutional provision. Only if an entity meets these standards is it then necessary to determine if the entity also meets the requirements of Act 55. As we discuss further herein, the Commonwealth Court in this matter ruled that the Hospital did not meet the fifth *HUP* requirement — that it did not operate entirely free from a private profit motive — hence, it never reached the question of whether the Hospital also met the requirements of Act 55, and we do not consider that question herein.

authority to limit capital expenditures by the Hospital. Trial Court Opinion, 2/23/22, at 5. Additionally, Tower Health collects all revenues from the Hospital's operations and deposits them into its own checking account. *Id.* Further, as indicated above, Tower Health provides the Hospital with management and administrative services, and, for each fiscal year from 2018 to 2020, Tower Health charged the Hospital, as a management fee, its own estimated value of the services which it provided to the Hospital during that year. The evidence presented indicated that, during the fiscal year 2018, Tower Health assessed the Hospital $4,496,892 for this fee. *Pottstown*, 289 A.3d at 1154. In fiscal year 2019, the fee grew to $10,933,807, and for fiscal year 2020 the fee rose again to $23,167,640. *Id.*

The trial court also took note of the value of "uncompensated care," which is care the Hospital furnished in each of these fiscal years, but for which it received either no compensation or reduced compensation from the recipient of the services, or from third-party payors such as insurance companies or government medical assistance programs. Trial Court Opinion, 10/8/21, at 7. The court found that: in fiscal year 2018, the value of such uncompensated care was $15,607,753; in fiscal year 2019, it was $27,801,908, and in fiscal year 2020, it amounted to $43,106,410. *Id.* at 7-9.

Regarding the revenues of the Hospital during these tax years, the court noted that in fiscal year 2018, the first year after its acquisition, the Hospital had a surplus in its net income of $12,687,723. *Id.* at 6. However, the Hospital thereafter incurred significant net income deficits in fiscal years 2019 and 2020 — $34,116,689 and $75,684,171, respectively. *Id.* at 8. The trial court observed that Tower Health made advances from its account to the Hospital's account to fund these losses. *Id*. In addition to these transfers, Tower Health also invested more than $47 million in infrastructure and

information technology upgrades at the hospital facilities from the date of its acquisition of the Hospital.  *Id.* at 9.

Regarding the question of executive compensation, the trial court found that the Compensation Committee approved the compensation paid to executives of both Tower Health and the Hospital, after deliberations with its outside consulting firm — Sullivan Cotter.  Trial Court Opinion, 2/23/22, at 7.  As is relevant here, the executives of both institutions were paid a base salary and benefits plus "annual incentive compensation."[6] *Id.* at 8.

The formula for calculating the amount of this annual incentive compensation, or bonus, for the executives of the Hospital during the fiscal years 2018 to 2020 provided that each executive was eligible to receive an additional percentage of his or her base salary if the Hospital achieved "target performance," and a higher percentage if it achieved "maximum performance."  *Id.*  The maximum performance percentage for all executives of the Hospital ranged from 22.5% to 45% of their base salary.  *Id.*

The calculation of this annual bonus was based on the Hospital meeting criteria in two categories: non-financial goals and financial performance.  The success of the Hospital in meeting non-financial goals constituted 60% of the amount of the total bonus which would be awarded to each executive.  Non-financial goals involved the Hospital achieving target expectations in areas such as "employee and provider engagement, patient experience, and quality [of care] and patient safety."  *Id.*  The remaining 40% of the bonus was dependent on the financial performance of the Hospital, which was generally based on the Hospital's annual operating margin.  *Id.*  The trial court found that,

---

[6] Each fiscal year, the Compensation Committee set a goal for the minimum operating margin of Tower Health which must be met in order for any incentive award to be paid, something the committee characterized as a "circuit breaker."  Trial Court Opinion, 2/23/22, at 9.  If that goal was not met, then the incentive program would be reduced or eliminated by the committee.  *Id.*

under these parameters, the Hospital executives could earn a maximum bonus of their base salary, based only on the Hospital's financial performance, ranging from 9% (0.225 x 0.40) to 18% (0.45 x 0.40). *Id.*

Tower Health met its minimum target goal for its operating margin in fiscal year 2018 — 0.5% — and executives received incentive bonuses in accord with the above-referenced distribution arrangement. *Id.* at 9. However, in fiscal year 2019, Tower Health failed to meet its target operating margin, and incentive bonuses based on financial performance of the Hospital were not paid, but the executives received a partial bonus of 50% for meeting non-financial criteria. *Id.* In 2020, due to the financial toll inflicted by the COVID-19 pandemic on the Hospital's operations, the incentive compensation program was wholly suspended, and it remained suspended in 2021. *Id.*

Consequently, in fiscal year 2018, the Hospital's President and CEO, Richard Newell, received $542,058, which included $75,132 in bonus money. In 2019, Newell's compensation dropped to $494,162, with $25,196 attributable to bonus money. Other Hospital executives received lesser amounts of remuneration. *Id.*

All of Tower Health's top executives, except for its President, Clint Matthews, were paid under a similar structure: they received an annual base salary, benefits, and an incentive bonus of up to 30% of base salary for achieving target performance, and 45% of base salary for maximum performance. *Id.* at 10. Performance for Tower's executives was additionally calculated using a weighted formula under which 75% of that metric was based on Tower Health's overall performance, and 25% was based on the executive's own performance in meeting his or her individual goals, as set by Tower Health. As with the Hospital's executives, 60% of the total amount of the bonus paid to Tower Health's executives was ultimately attributable to non-financial performance criteria, and 40% was based on Tower Health's financial performance. *Id.*

Tower Health's President, Matthews, received a larger bonus payment of 40% of base salary for target performance and 60% for maximum performance. Thus, the maximum annual percentage of his base salary he could receive as a bonus, based solely on Tower Health's financial performance, was 18% (0.40 x 0.75 x 0.60). *Id.* at 11.

Because Matthews had formerly been the President of Reading Health System, the Compensation Committee determined that he was best suited to manage the integration of all of the newly acquired hospitals into the Tower Health System, and, as a result of negotiations between the committee and Matthews, it was agreed that Matthews would receive a base salary for the 2018 fiscal year of $1,162,681, plus a lump-sum retrospective incentive payment for fiscal year 2017 as recognition of his role in negotiating the acquisition of the hospitals for Tower Health. *Id*. Thus, in the 2018 fiscal year, he received total compensation of $2,253,500, which reflected his base salary plus the incentive payment and his performance bonus, although had he achieved the maximum performance bonus, he could have received $2,521,100. *Id.*

In fiscal year 2019, Matthews' base salary was increased to $1,330,000, and with his performance bonus, his total compensation reached $2,388,408. *Id.* at 12. Once more, this was less than the salary he could have earned had he achieved the maximum performance bonus — $2,740,750. In fiscal year 2020, because Matthews left his position as President of Tower Health, he received no salary. *Id.* at 11.

The trial court found that the compensation of other executives at Tower Health was lower, but, nevertheless, "substantial." *Id.* at 12. The court noted that Tower Health's Chief Operating Officer and Chief Financial Officer received total compensation in excess of $1,000,000 in both fiscal year 2018 and 2019, while its Chief Medical Officer received more than $1,000,000 in total compensation in fiscal year 2019. *Id.* at 12.

Based on all the evidence received during the trial, the trial court held that the Hospital satisfied each of the five *HUP* requisites for classification as a purely public charity. In the trial court's view, the first four elements were satisfied because the Hospital had an open admission policy accepting patients regardless of their ability to pay, and it donated a substantial portion of its services because it delivered tens of millions of dollars in uncompensated medical care during the 2018, 2019, and 2020 fiscal years, thereby relieving the government of the burden of funding such care. *Id.* at 15.[7]

Regarding the fifth *HUP* factor, which is at issue in this appeal − whether the Hospital operated "entirely free from private profit motive," Trial Court Opinion, 2/23/22, at 17 (quoting *HUP*, 487 A.2d at 1317) − the trial court highlighted that our Court recognized that whether an institution operates entirely free from a private profit motive is dependent, in part, on the amount the institution pays to its management in the form of salaries and other fringe benefits. The trial court noted that we previously indicated that the amount of such salaries and fringe benefits should be reasonable, and not excessive, as compared to other institutions providing the same types of services to the public. *Id.* at 18-19 (citing *West Allegheny Hospital v. Board of Property Assessment, Appeals and Review*, 455 A.2d 1170, 1172 (Pa. 1982) (upholding charitable tax exemption where the compensation of two founding physicians of a hospital for administrative positions was "necessary to the functioning of [hospital's] facilities and has been paid for at rates equal

---

[7] Specifically, as noted above, the court found that the "Hospital donated, or gratuitously rendered for the benefit of the community, care in fiscal years 2018 through 2020 in the amounts of $15,607,753, $27,801,908, and $43,106,410, respectively." Trial Court Opinion, 10/8/21, at 28-29. These amounts included costs for charity care, for which no fee was charged, bad debt write-offs, and undercompensated care provided to patients on Medicare or Medicaid. *Id.* at 29. The court observed that, in fiscal year 2018, the Hospital's net income was $12,687,723, and the Hospital's donations to the community exceeded that net income. In fiscal years 2019 and 2020, the Hospital experienced net deficits in its income of $34,116,689 and $75,684,171, respectively, and, thus, in those years, the Hospital's donations to the community exceeded the Hospital's net income by "a significant margin." *Id.*

to or less than the rates paid by comparable institutions for comparable services"); *St. Margaret Seneca Place v. Allegheny County Board of Assessment Appeals & Review*, 640 A.2d 380, 385 (Pa. 1994) ("payment of excessive salaries and fringe benefits to corporate officers might evidence a private profit motive"); *Wilson Area School District v. Easton Hospital*, 747 A.2d 877, 881 (Pa. 2000) (concluding a hospital operated free from private profit motive, in part, because its executives "receive reasonable salaries, and do not receive any other bonuses or fringe benefits")).

The trial court next examined two leading cases from the Commonwealth Court which addressed whether particular bonus compensation structures for executives of non-profit entities made the amount of their bonuses too heavily dependent on the financial performance of the entity, so as to disqualify it under the *HUP* test from receiving a charitable tax exemption: *In re Dunwoody Village*, 52 A.3d 408 (Pa. Cmwlth. 2012), and *Phoebe Services v. City of Allentown*, 262 A.3d 660 (Pa. Cmwlth. 2021).

In *Dunwoody Village*, a non-profit corporation which operated a retirement home was denied a real estate tax exemption because the trial court determined that it did not meet any of the five prongs of the *HUP* test, and the Commonwealth Court affirmed. Of relevance to the instant matter, the Commonwealth Court upheld the trial court's determination that the non-profit corporation had failed to demonstrate that it operated entirely free from a private profit motive, due to the percentage of its executive compensation which was dependent on "financial or marketplace performance." *Dunwoody Village*, 52 A.3d at 422. Specifically, the court noted that the non-profit corporation's CEO maximum incentive compensation based on financial performance was 24% of base salary, and its CFO's maximum incentive compensation based on financial performance was 18-19%. *Id.* at 423. The Court found these amounts constituted a "substantial percentage" of the executives' total compensation, and, thus,

precluded the non-profit corporation from establishing that it operated entirely free from a private profit motive as *HUP* requires. *Id.*

In *Phoebe Services*, a company which furnished various management and administrative services to its parent non-profit corporation, which itself provided healthcare and housing services to the elderly, sought an exemption from the City of Allentown's business privilege tax on the basis that it did not engage in any activity for gain or profit within the city, as the tax ordinance required. The trial court, after considering evidence presented regarding, *inter alia*, the company's organizational structure, principal activities, and the compensation of its executives, agreed with the company's assertion that it was exempt from the business privilege tax on this basis.

The City argued on appeal that the company did not qualify for the tax exemption because the services it provided were not charitable in nature. The Commonwealth Court ultimately upheld the trial court's decision that the company's activities did not constitute business within the meaning of the ordinance, but it went on to consider whether the company also qualified under the *HUP* test as a purely public charity, given that the ordinance specifically exempted such entities from the tax. In considering whether the company met the *HUP* requirement that it must operate entirely free from private profit motive, the Court examined the executive compensation structure of the company and, while it noted the similarity between its performance incentives and those at issue in *Dunwoody Village*, the court did not find them disqualifying, opining:

> [T]he evidence in this case does not demonstrate that the compensation was excessive, unreasonable, or related to Phoebe Services' financial performance. Phoebe Services' Chief Executive Officer's bonus and incentive pay may exceed 25% of base compensation. . . . However, evidence was presented that Phoebe Services' incentive pay plan is typical of other healthcare nonprofits, represents fair market value for the services provided, and is not directly tied to the financial status of the nonprofit. . . . According to the testimony

> presented, most of the base salaries for Phoebe Services'
> executive leadership are positioned below the 75th percentile
> market salary level, and all base salaries are positioned below
> the 90th percentile market salary level. . . . In fact, the City
> admitted that "[t]he compensation scheme is designed to stay
> competitive within the market, and retain employees rather
> than lose the employees to competitors in the market," and
> that "[o]rganizations that do not use incentive plans run high
> operating costs and risk financial viability and run the risk of
> having noncompetitive compensation packages."

*Phoebe Services*, 262 A.3d at 671 (citations omitted).

Synthesizing these cases, the trial court in the present case discerned two requirements which executive compensation pay packages were required to meet in order for the institutions they govern to be considered to operate free from private profit motive: the amount of their compensation must not be excessive; and it must be reasonable, which, based on its reading of *Dunwoody,* the trial court interpreted to mean that financial performance could not constitute a "substantial percentage of total compensation." Trial Court Opinion, 2/23/22, at 22 (internal quotation marks omitted).

Noting that these principles were "so broad that they necessarily leave significant discretion to the trial court," *id.* at 23, Judge Saltz proceeded to apply them to examine the amount of compensation paid to both the Hospital's executives *and* Tower Health's executives. The court deemed it appropriate to include the compensation of Tower Health's executives, based on its conclusion that they could realize the benefit of any financial surplus the Hospital achieved, as it would help fund their own salaries. *Id.* at 24.

The court was troubled by the "sheer size" of the compensation paid to Matthews as the CEO of Tower Health, characterizing the $2,253,500 paid him in fiscal years 2018 to 2019 as "eye-popping." *Id.* The court, while acknowledging that the testimony it received established that Matthews' compensation represented fair market value for his

services and was intended to be competitive, observed that it nevertheless placed him in the 85th to 90th percentile compared to the salaries of other CEOs at similar institutions. *Id.* at 25. The trial court indicated that it was inclined to find this amount of compensation excessive, and that it would have done so, except for the Commonwealth Court's decision in *Phoebe Services*.

The court noted that, in *Phoebe Services,* the CEO's bonus and incentive compensation exceeded 25% of his base salary, and his base salary was in the 90th percentile as compared to his peers. *Id.* at 25. Consequently, the court reasoned that, because Matthews' salary structure was sufficiently similar to that one, it likewise could not be deemed to be so excessive as to preclude the Hospital from being granted a tax exemption. *Id.* at 26. Because the salaries of the other executives of the Hospital and Tower Health were similarly structured, and below Matthews' level, the court concluded that they too were not excessive. *Id.*

Turning to the question of whether the percentage of the executives' compensation that was due to financial performance could be deemed excessive under this caselaw, the trial court recognized that, in *Dunwoody Village*, the Commonwealth Court concluded that performance bonuses constituting 24% of total salary for the CEO, and 18-19% for the CFO, were impermissibly high, but the trial court distinguished that case, given that, therein, the non-profit corporation charged very high entrance fees to be admitted to the retirement community which the trial court regarded as an "overwhelming" factor that contributed to the Commonwealth Court's conclusion. *Id.* at 27.

The trial court additionally considered the School District's argument that, in determining whether the Hospital was entitled to a tax exemption, the court should

consider the finances and operations of Tower Health, and not just the Hospital − that is, only if Tower Health independently satisfied the requirements of *HUP* would the exemption be granted. In rejecting this argument, the trial court observed that the Commonwealth Court has held that a charitable tax exemption for an institution must be determined by the finances and operation of that entity, not other related entities, and that only when the corporation seeking the exemption can be considered merely a "sham" corporation, or "alter ego" of the related corporate entity, can that corporation's structure and finances be considered. *Id.* at 28 (citing, *inter alia*, *St. Joseph Hospital v. Berks County Board of Assessment Appeals*, 709 A.2d 928, 936 (Pa. Cmwlth. 1998) ("The issue of a parent corporation's control over a subsidiary corporation . . . is relevant . . . *only* if the degree of control exercised by the parent corporation is so substantial that the subsidiary corporation is, in reality, not a *bona fide* independent corporation." (emphasis original)); *In re Community General Hospital,* 708 A.2d 124, 130 (Pa. Cmwlth. 1998) ("[C]ontrol of a parent corporation over a corporate subsidiary is relevant in a charitable tax exemption case *only* where, under the analysis utilized when determining whether to pierce the corporate veil, the parent's level of control is so great that the subsidiary is merely a sham corporation or, in other words, the alter ego of the parent." (emphasis original)).

The trial court found that the School District "stopped short" of alleging that the Hospital was a mere alter ego of Tower Health, or a sham corporation; in any event, the court held that the evidence it heard did not support such a conclusion. Trial Court Opinion, 2/23/22, at 29. The court found that, though Tower Health had significant authority and control over the Hospital's finances and operations, such authority was,

nevertheless, "fully consistent with the Hospital's status as a limited liability company, in which the members of the LLC are granted broad managerial authority." *Id.*

The court found that there was no evidence that Tower Health disregarded the Hospital's status as a separate entity. Moreover, the trial court determined that the revenue flow between the two companies was a "two-way street," because, during the three tax years in question, the Hospital ran a surplus only the first year, of a little over $12 million. *Id.* at 29. However, in the latter two years, the Hospital lost over $97 million, which losses Tower Health covered, while at the same time making significant capital improvements to the hospital facilities. In the trial court's view, these factors belied any claim that "Tower Health was exploiting the Hospital or using it as a mere instrumentality." *Id.* at 30. Consequently, the trial court ruled that the Hospital qualified as an entity that was a purely public charity under *HUP,* and that it was therefore entitled to an exemption from real estate taxes.

The School District appealed to the Commonwealth Court, challenging the Hospital's tax exemption. An *en banc* panel of the Commonwealth Court reversed in a unanimous, published opinion authored by Judge Christine Fizzano Cannon.[8]

Relevant to the case *sub judice*, the *en banc* tribunal first considered and summarily rejected the School District's claim that Tower Health, by virtue of its degree of control over the Hospital's operations, was the true party in interest, and therefore its own charitable status and entitlement to a tax exemption under the *HUP* test must be established in order for the Hospital to be granted the exemption. The court distinguished

---

[8] Judge Fizzano Cannon's opinion was joined by President Judge Renee Cohen-Jubelirer, and Judges Patricia McCullough, Anne Covey, Ellen Ceisler, and Lori Dumas.

this matter from its prior decision in *Community General Hospital*, *supra,* wherein it held that it was appropriate to "pierce the corporate veil" of a parent corporation to determine the tax-exempt status of its subsidiary. The court concluded that, though the structure of the Hospital, as a member-managed LLC[9], was different, that fact, standing alone, furnished no basis to pierce the corporate veil.

The Commonwealth Court next considered whether the Hospital operated free from a private profit motive. In making this determination, the Commonwealth Court principally relied upon our Court's decision in *Wilson Area School District, supra,* observing that, when determining whether an entity operates free from private motive, a court must focus on how the entity's revenue is used, and specifically consider whether revenue: (1) is generated with the expectation of a reasonable return or some non-monetary benefit; (2) ultimately supports or furthers the eleemosynary nature of the charitable entity; and (3) inures, directly or indirectly, to any private individual related to the charitable entity or related organizations. *Pottstown School District*, 289 A.3d at 1150-51 (citing *Wilson Area*, 747 A.2d at 880). The court further explained that, in its view, consistent with *HUP's* requirement that revenue of a charitable organization not be used for the "private or pecuniary return" of any individual, the third factor enumerated in *Wilson Area* "requires consideration of whether the amount of executive compensation is reasonable, and the extent, if any, to which it is based on the financial performance of the institution." *Id.* at 1151 (citing *HUP*, 487 A.2d at 312). Like the trial court, the Commonwealth Court considered the details of the compensation packages of the executives of both the Hospital and Tower Health to be pertinent to this determination.

---

[9] *See* s*upra* at note 1.

While the Commonwealth Court considered the trial court's analysis of this question to be "careful," contrary to the trial court, the Commonwealth Court did not find *Phoebe Services* to be applicable, noting in that case the executive compensation at issue "was 'not directly tied to the financial status of the nonprofit.'" *Id.* at 1152-53 (quoting *Phoebe Services*, 262 A.3d at 671). The court further rejected the notion that executive salaries must be deemed reasonable merely because they do not exceed the 90th percentile for such salaries. Instead, the court reasoned that *Dunwoody Village* was more analogous, opining that, therein, the court found that the executives' maximum incentive bonus of 18-24% of their total salary, based upon financial performance, was substantial enough to preclude purely public charity status. *Id.* at 1153.

Agreeing with the trial court's characterization of Tower Health's CEO's salary as "eye popping," the court held that "tying 40% of the bonus incentives to the Hospital's financial performance is sufficiently substantial to indicate a private profit motive, contrary to the *HUP* test." *Id*. at 1153-54 (footnote omitted).

Additionally, the Commonwealth Court determined that the trial court "did not acknowledge or consider any evidence regarding the reasonableness of the charges imposed by Tower Health for the management and administrative services it provided to Hospital." *Id.* at 1154. The court characterized these fees as growing "exponentially," increasing over fivefold: from $4,446,862 in fiscal year 2018, to $23,167,740 for fiscal year 2020. The Commonwealth Court concluded that no evidence was adduced at trial to establish the reasonableness of such fees, given that a witness for the Hospital admitted that the Hospital never studied the fees to determine if they were fair or reasonable in relation to the services provided. Hence, the court held that the Hospital

failed to satisfy all factors of the *HUP* test and, therefore, was not entitled to the real estate tax exemption for the 2018 to 2020 fiscal years.

The Hospital sought allowance of appeal with our Court, which we granted to consider whether the operations of the Hospital's related entity — Tower Health — and the compensation of its executives is relevant to whether the Hospital qualifies as a purely public charity under *HUP*. We also agreed to examine whether the Commonwealth Court erred by holding that the Hospital's executives' compensation, based upon financial performance, precluded it from establishing that it was operating entirely free from private profit motive. *Pottstown School District v. Montgomery County Board of Assessment Appeal*s, 305 A.3d 959 (Pa. 2023) (order).

## II. Issues and Analysis

### A. Relationship between Tower Health and the Hospital and the Compensation of Tower Health Executives

Inasmuch as the rationale of the Commonwealth Court for disallowing the Hospital's charitable tax exemption rested primarily on the level of compensation paid to Tower Health's CEO, and the reasonableness of the management and administrative fees which Tower Health charged the Hospital, we necessarily begin by addressing whether these were relevant considerations in determining the entitlement of the Hospital, as a separate but related corporate entity, to tax exemption under *HUP*.

#### 1. Arguments

The Hospital argues that, in assessing its tax exemption, the Commonwealth Court erred by considering the activities of its parent, Tower Health, a separate legal entity. The Hospital notes that, while the Commonwealth Court held that Tower Health was not the "true party in interest," the court then considered what it deemed to be Tower Health's

excessive executive salaries, its financially-based incentive compensation plan, and the management fees it charged. The Hospital underscores that these considerations improperly focus upon the activities of Tower Health, not the Hospital, which is contrary to the Commonwealth Court's decision in *Community General*, *supra*, wherein the court held that only the activities of the corporation applying for a charitable exemption are relevant. *See Community General*, 708 A.2d at 130 ("[O]nly the activities of the corporation applying for the charitable exemption will be considered in determining its eligibility for tax exempt status.").

Further, the Hospital acknowledges that, while courts may consider management fees paid by non-profits to related entities, it asserts such concern over the size of the fees in the instant matter is unfounded because of the substantial and undisputed evidence presented at trial regarding the reasonableness of the fees. The Hospital contends that the Commonwealth Court was therefore not at liberty to *sua sponte* raise the issue and render factual findings in contravention of the record, which established that the fees were market value. Accordingly, the Hospital asks this Court to reverse the Commonwealth Court's decision and hold that a non-profit corporation cannot be denied a tax exemption based on the actions of its related non-profit entities.[10]

---

[10] Two *amici* have filed briefs in support of the Hospital's position in this matter: the Healthsystem Association of Pennsylvania ("HAP") and the Lehigh Valley Health Network, Inc. ("LVHN"), which has 13 hospital campuses and related entities.

HAP notes that the Commonwealth Court decision initially and properly recognized that the Hospital was the true party in interest. Thus, HAP maintains that, given this recognition, the Court should then have followed its prior precedent in cases such as *Community General* and *St. Joseph Hospital* and restricted its inquiry only to the operations of the Hospital, because those cases establish that, in determining whether a non-profit entity is entitled to a charitable tax exemption, it is the operation of the entity itself which is determinative, not the operation of related entities.
(continued…)

The School District responds that the Commonwealth Court properly considered the activities of Tower Health in determining whether the Hospital was entitled to the tax exemption because the evidence established that Tower Health had complete legal and operational control over all revenues generated by the Hospital and used them to fund the Hospital's incentive compensation payment, salaries, and other expenses. The School District acknowledges the Commonwealth Court's holding in *Community General*, but reminds that the court held in that case that the activities of a company related to the entity seeking a tax exemption may be considered where that company significantly controls the entity applying for tax exemption, which it maintains is the situation here. The School District contends that, in *St. Joseph Hospital, supra*, the Commonwealth Court also recognized that the degree of control the parent corporation has over its subsidiary is relevant, as are the financial connections between the parent and its subsidiary. Accordingly, in that case, the court considered the issue of "management fees" paid to the parent by the subsidiary. Although the court ultimately found that the record established that the services provided in exchange for such fees would be more expensive if purchased in the open market, by contrast, in the instant matter, the School District argues that the Hospital presented no evidence relating to exactly what services

Moreover, it contends that the Commonwealth Court's decision will have the effect of discouraging consolidation of financially troubled healthcare systems with larger ones who have greater resources, merely because the executives at the larger entities are more highly compensated for their management duties. HAP maintains that such consolidations are increasingly necessary because of their cost-savings benefits, given the increasing financial strain on smaller hospitals and healthcare providers. Additionally, HAP argues that the Commonwealth Court's holding in this matter will "have a chilling effect on the ability of nonprofit hospitals to fashion competitive compensation systems that promote the health of those institutions and allow them to attract and retain qualified executives." HAP Brief at 4.

the Hospital received for the management fees, thereby failing to demonstrate their reasonableness. The School District avers that an examination of all of Tower Health's activities relating to its acquisition of the Pottstown hospital facility and its formation and operation of the Hospital would establish that they were done for a private profit motive.[11]

## 2. Analysis

Our standard of review in an appeal involving a trial court's decision that an entity is exempt from taxation under Article VIII, Section 2 of our Constitution as a purely public charity requires us to determine whether the trial court abused its discretion, or committed an error of law, and, also, whether its decision was supported by substantial evidence of

---

[11] The Pennsylvania AFL-CIO, and Phoenixville Area School District and Wyomissing Area School District have each filed *amicus* briefs in support of the School District. Regarding this issue, the AFL-CIO highlights that, because a vast majority of hospitals in Pennsylvania have been integrated into larger hospital systems (85%), it is necessary to consider the operation of related entities to determine whether the applicant qualifies as a purely public charity under the *HUP* test. It emphasizes that, while a commonly held belief is that hospital consolidation improves efficiency and curbs costs, in reality it does the opposite by increasing prices; shrinking accessibility and services offered to healthcare consumers, particularly in rural areas; and negatively impacting working conditions and wages of healthcare workers. In AFL-CIO's view, Hospital consolidations also give integrated healthcare entities significant, monopoly-like power over workers and consumers, which is utilized to secure unprecedented profits. AFL-CIO asserts that to ignore these economic realities when determining tax-exempt status would lead to the loss of municipalities' vital tax revenue, which will, in turn, adversely impact our communities, public schools, and municipal services.

Phoenixville Area School District and Wyomissing Area School District argue that the Commonwealth Court properly looked to the activities of Tower Health to determine whether the Hospital was tax-exempt because the Hospital's revenues could be used to pay what they consider to be Tower Health's excessive compensation packages, considering that all of the Hospital's revenues were placed directly into Tower Health's checking account. They argue that a holding to the contrary would create an escape hatch which allows an institution to be classified as a purely public charity, even though its revenue inures to individuals employed by a parent organization operating with a private profit motive, given that our Court held in *Wilson Area School District* that an organization cannot be considered a purely public charity under *HUP* when its utilization of revenue "inures, directly or indirectly, to . . . related organization(s)." Phoenixville/Wyomissing Brief at 13 (quoting *Wilson Area School District*, 747 A.2d at 880) (emphasis omitted).

record.  *Wilson Area School District*, 747 A.2d at 879 n.5.  Thus, "[t]he question of whether an entity is a 'purely public charity' is a mixed question of law and fact on which the trial court's decision is binding absent an abuse of discretion or lack of supporting evidence." *Community Options, Inc. v. Board of Property Assessment*, 813 A.2d 680, 683 (Pa. 2002).

Where the trial court's determinations involve questions of law, our standard of review is *de novo*, and our scope of review is plenary.  *Tech One Associates v. Board of Property Assessment Appeals*, 53 A.3d 685, 696 (Pa. 2012).  However, findings of fact made by the trial court which are supported by substantial evidence of record are binding and will not be disturbed on appeal.  *Margaret Seneca Place v. Board of Property Assessment and Review*, 640 A.2d 380, 383 (Pa. 1994).

As our Court has recognized, application of the *HUP* test requires consideration of whether the utilization of the revenue by the entity seeking the tax exemption "inures, directly or indirectly, to any private individual related to the charitable entity or related organization(s)."  *Wilson Area School District*, 747 A.2d at 880.  Thus, in accordance with these principles, as the trial court in this matter recognized, the compensation of the corporate executives of the entity is a relevant consideration, inasmuch as the revenues of that entity are being used to pay these individuals.  Likewise, to the degree that the entity's revenues are indirectly financing the salaries of executives in other organizations related to the entity because of the financial relationship between them, this too may be a relevant consideration.  However, considerations of the latter factor are dependent on the particular attributes of the fiscal and operational relationship between the two entities and the degree of independence they have from one another in setting executive compensation.

One of the polestar presumptions regarding the nature of business corporation structure is that a duly incorporated parent corporation and its subsidiary are separate

entities for all purposes. *See generally United States v. Bestfoods,* 524 U.S. 51, 61 (1998). This presumption applies even when the parent corporation is the sole owner of the subsidiary corporation. *Id.*; *Lumax v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). This presumption is so weighty that it may be overcome only in limited situations, such as when "one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests," or in instances where there is "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetrate a fraud." *Mortimer v. McCool*, 255 A.3d 261, 268 (Pa. 2021) (citations omitted). Only when such extraordinary circumstances are present may the "corporate veil" be "pierced," and the existence and legal effect of the separate corporate forms be disregarded. *Id.* This presumption generally applies with equal force to non-profit corporations. *See generally Fletcher Cyclopedia of the Law of Corporations*, § 41.75.

As previously and briefly discussed, the Commonwealth Court has consistently applied these precepts in a trilogy of cases assessing the impact of the operational relationship between a non-profit parent corporation and its subsidiary, or a non-profit corporation and its sister non-profit corporation, and the financial relationship between them for purposes of the *HUP* test. In *Sacred Heart Health Care v. Commonwealth*, 673 A.2d 1021 (Pa. Cmwlth. 1996), that tribunal considered whether a non-profit corporation, Sacred Heart Healthcare Services "SHHS," which was formed to furnish administrative and support services to a hospital, was itself entitled to claim the hospital's charitable exemption from Pennsylvania's sales and use tax. SHHS argued to the Commonwealth Court that it should be considered "an integral part of the [h]ospital," and, therefore, the functions of the hospital should be attributable to it. *Id.* at 1025.

The court rejected that argument, based on the fact that SHHS was a separate non-profit corporation from the hospital and, despite their close operational relationship, was "an independent entity." *Id.* The court emphasized that the corporate form could not be disregarded, and that, "[w]here a taxpayer divides itself into separate corporate entities, the taxpayer cannot insist that the Commonwealth ignore those distinct legal entities so as to find that it is something that it is not." *Id.* Hence, the court considered only the activities of SHHS in applying the *HUP* test.

Subsequently, in *St. Joseph Hospital, supra,* the Commonwealth Court applied its holding in *Sacred Heart* to determine whether a healthcare corporation, St. Joseph Health ("SJH"), was entitled to a charitable tax exemption despite the fact that its parent corporation, FHS, which was the sole corporate member of SJH, exercised "considerable" control over its management and operations. 709 A.2d at 930. The court held that this factor alone was not a sufficient basis to deny tax-exempt status to the subsidiary:

> The issue of a parent corporation's control over a subsidiary corporation, under the analysis in *Sacred Heart,* is relevant, in our view, *only* if the degree of control exercised by the parent corporation is so substantial that the subsidiary corporation is, in reality, not a *bona fide* independent corporation. In this regard, we find the equitable principles and legal criteria utilized in determining whether to "pierce the corporate veil" in other areas of the law to be useful.
>
> Pennsylvania law allows the corporate form to be disregarded in situations where there is gross undercapitalization, failure to adhere to corporate formalities, substantial intermingling of personal and corporate affairs, and the use of the corporate form to perpetrate a fraud. . . . And, where a parent corporation dominates a subsidiary corporation to the degree that it is a mere instrumentality or sham corporation, the corporate existence of the subsidiary may be disregarded. . . . In the present case, the trial court found that FHS controlled SJH based on the following facts: FHS is the sole corporate member of FHC which, in turn, is the sole corporate member of SJH; FHS controls SJH's Board of Trustees . . . FHS approves SJH's budget and certain

decisions regarding capital investments; and FHS hires and pays SJH's Chief Executive Officer. Critically, the trial court did not find as a fact that SJH was not a *bona fide* corporation, that it had no independent decision making power at all, or that its corporate status should be disregarded. *. . .* [W]hile FHS has enormous control over SJH, the facts here do not indicate that SJH is so dominated by FHS that its very existence is reduced to a mere sham. Therefore, regardless of the fact that FHS has considerable control over SJH, because SJH is a corporation separate and distinct from FHS, it is the tax exempt status of SJH alone which is at issue in this appeal.

*Id.* at 936-37 (citations omitted; emphasis original).

Lastly, in *Community General, supra,* the court extended these holdings to rule that "only the activities of the corporation applying for the charitable exemption will be considered in determining its eligibility for tax exempt status, although those activities might well include the diversion of excess revenues to sibling corporations." 708 A.2d at 130. Accordingly, the court held that a hospital's transfer of revenue in the form of payment of management fees to its parent corporation, which owned and controlled it, did not preclude the hospital from claiming tax exempt status. The court reached this conclusion despite the fact that the parent corporation had the power to elect and remove the members of the subsidiary's board of trustees, and paid its CEO's salary, because there was no factual evidence which established that the "[hospital] was a not a bona fide corporation, that [it] had no independent decision making power, or that [its] corporate form was being used to perpetrate a fraud." *Id.* Although the court found the amount of fees paid to be "hefty," it nevertheless ruled that their payment did not constitute evidence of a profit motive sufficient to deny the hospital tax exempt status under *HUP*, given that the management services it received in return improved its overall functioning. *Id.* at 131.

Our Court has also emphasized, albeit in the area of for-profit corporations, that when there exists a parent-subsidiary relationship between two corporations, the eligibility of each corporate entity for a tax exemption must be considered separately whenever determining its eligibility. *See, e.g.*, *Commonwealth v. Weldon Pajamas, Inc.*, 248 A.2d 204, 207 (Pa. 1968) (holding that corporate form would not be disregarded to enable parent corporation to take manufacturing tax exemption available to its subsidiary, because the activities of parent and subsidiary corporations were different, with only the subsidiary engaged in the activity of manufacturing within the Commonwealth); *Shelburne Sportswear, Inc. v. City of Philadelphia*, 220 A.2d 798, 800 (Pa. 1966) (holding that a corporation subject to a mercantile tax could not evade that obligation merely because it was an affiliate of another corporation exempted from the tax, due to the fact that non-exempt corporation had its own separate form and structure, and it operated as an independent business entity).

In accordance with these established principles of law, when a corporate entity seeking a charitable tax exemption under Article VIII, Section 2 is a subsidiary or affiliate of another corporation, it will ordinarily be regarded as its own separate entity.[12] Consequently, its independent corporate form and structure will be honored by courts

---

[12] The School District does not argue that the Commonwealth Court's decisions discussed above should be overruled. Likewise, no party suggests that the structural and operational nature of the parent-subsidiary relationship between the Hospital and Tower Health, which is common in the modern healthcare industry, effectively renders them a single "institution" as that term is used in Article VIII, Section 2. *See, e.g.*, *G.D.L. Plaza Corporation v. Council Rock School District*, 526 A.2d 1173, 1175 (Pa. 1987) ("[T]o obtain the claimed exemption from taxation, [the claimant] must affirmatively show that the *entire institution . . .* is one of purely public charity." (quoting *Woods School Tax Exemption Case*, 178 A.2d 600, 602 (Pa. 1962)) (internal quotation marks omitted and emphasis added)). We therefore do not address that question.

unless there is evidence establishing a reason to pierce its corporate veil. Such evidence includes: its gross undercapitalization; a failure to adhere to corporate formalities; a substantial intermingling of personal and corporate affairs; the use of the corporate form to perpetrate a fraud; or where a parent or affiliate corporation dominates the non-profit corporation to the degree that it can be regarded as a sham corporation, or a mere instrumentality or alter ego of the parent or affiliate. *St. Joseph Hospital*, 709 A.2d at 936; *Mortimer*, 255 A.3d at 270. Absent evidence of this nature to justify piercing the corporate veil, we hold that only the salaries of the executives of a corporation seeking the tax exemption, and the net impact the payment of fees by that organization to a parent or affiliate corporation has on its *own* ability to fulfill its charitable mission, are relevant under the *HUP* test. *See Wilson Area School District*, 747 A.2d 881 (in determining whether the revenues of the organization are being utilized so that it operates entirely free from profit motive as required by *HUP*, "any analysis which focuses on the status of the organizations which receive the money [is improper]. Rather, the analysis is properly directed at whether the money is being used in furtherance of the organization's charitable purpose").

In the case *sub judice,* the trial court found that the School District "expressly disclaimed . . . that the separate existence of Tower Health and the Hospital should be disregarded under the common-law doctrine of piercing the corporate veil." Trial Court Opinion, 2/23/22, at 28. Moreover, and importantly, the trial court determined that

> [a]lthough Tower Health does exercise significant authority over the finances and operations of the Hospital, that authority is for the most part inherent in, and consistent with, Tower Health's status as the sole owner of the Hospital. Tower Health's management of the Hospital is fully consistent with the Hospital's status as a limited liability company, in which the members of the LLC are granted broad managerial authority. *See* Pennsylvania Uniform Limited Liability Company Act of

2016, § 8847(b)(1), 15 Pa.C.S. § 8847(b)(1) ("Except as expressly provided in this title, the management and conduct of the company are vested in the members."). Moreover, there was no evidence that Tower Health disregarded the separate existence of the Hospital entity. . . .

Although Tower Health absorbs the revenues of the Hospital, the relationship is a two-way street . . . [D]uring the fiscal years 2018 through 2020, the Hospital ran a surplus only one year − less than $12.7 million in fiscal 2018 − and its cumulative revenue for the three years was a net loss of more than $97 million. During that same time period, Tower Health not only absorbed the Hospital's losses but funded more than $47 million in capital investments in the Hospital. . . . The figures hardly indicate that Tower Health was exploiting the Hospital or using it as a mere instrumentality.

*Id.* at 29-30.

Likewise, before us, the School District does not assert that the Hospital's status as an independent corporate entity should be disregarded; rather, it argues only that the degree of control exerted by Tower Health over the Hospital and the size of the management fee charged by Tower Health justifies consideration of Tower Health's executive compensation package, and the alleged excessiveness of the management fee it charged the Hospital, for purposes of the *HUP* test. However, we find that the mere dollar size of these items, standing alone, is insufficient in the absence of facts which demonstrated that it was not acting as a corporate entity independent from Tower Health when it made decisions regarding the use of its own revenues to pay for those things, or evidence which established that Tower Health improperly used its parent relationship, or otherwise coerced the Hospital into departing from regular corporate practices in making decisions about these matters. As the trial court determined that the evidence it was presented did not support such a conclusion that piercing the Hospital's corporate veil was appropriate, and its decision is supported by substantial evidence, the size of

compensation of Tower Health's executives and the amount of the management fees which the Hospital paid Tower Health are insufficient by themselves to render the Hospital ineligible for a tax exemption under the *HUP* test. Accordingly, we conclude that, under these circumstances, the Commonwealth Court erred by resting its decision on these two considerations.

## B. Compensation received by the Hospital's executives

We turn now to the question of whether the structure and the amount of compensation received by the Hospital's executives disqualified it from receiving a charitable tax exemption under *HUP* − that is, whether the compensation was so excessive that it constituted a private or pecuniary personal gain to the executives receiving it and did not primarily serve a public purpose.

## 1. Arguments

The Hospital characterizes the Commonwealth Court's decision as standing for the proposition that a non-profit is not entitled to tax exemption if a "substantial percentage" of its employee incentive compensation is based on the non-profit's financial performance. Hospital Brief at 25. However, in the Hospital's view, neither Article VIII, Section 2 of the Pennsylvania Constitution nor the *HUP* test support this holding. *Id.* The Hospital reminds that the purpose of Article VIII, Section 2 − limiting tax exemption to non-profits that are "institutions of purely public charity" − was to curb legislative abuses of exempting from taxation properties which serve private interests; however, the Hospital asserts Section 2 does not require non-profits to pay below-market salaries or avoid reasonable employee incentives. *Id.* at 29 (quoting *Mesivtah Eitz Chaim of Bobov*, 44 A.3d at 8 (the purpose of Section 2 was to prevent favoritism by special legislation)).

The Hospital contends that the Commonwealth Court failed to consider the true intent of Section 2, and, instead, attempted to harmonize *Dunwoody Village,* and *Phoebe Estates*, *supra*, which the Hospital contends "took it far afield from Article VIII, Section 2 and *HUP*." *Id.* at 31. The Hospital highlights that there is an irreconcilable tension between these two decisions, pointing out that, in *Dunwoody Village*, the court held that paying an executive, "in part," based on financial performance, "*combined* with 'retirement and savings plans' offered to employees, constituted substantial evidence for the trial court's determination that the entity did not operate entirely free from a private profit motive." *Id.* (emphasis original). By contrast, in *Phoebe Services*, the court held that neither the maintenance of an incentive plan, nor the paying of salaries below the 90th percentile of all other comparable executive salaries, disqualified the organization from receiving a charitable tax exemption. Thus, in the Hospital's view, the two cases reach opposite conclusions about whether paying competitive salaries and offering financial performance incentives evidence a private profit motive; in any event, the Hospital contends these cases cannot be read to establish the "substantial percentage" test which the *en banc* panel below utilized. *Id.* at 32.

The Hospital contrasts the facts of the instant case with the factors relied on by the *Dunwoody Village* court in analyzing the fifth *HUP* prong, noting that the court in *Dunwoody Village* held that a *combination* of factors supported the trial court's determination that the entity did not operate free from a private motive, such as paying employees an *undisclosed* percentage of incentive compensation based on financial performance, and offering certain retirement and savings plans. The Hospital asserts that, consequently, *Dunwoody Village's* holding does not indicate that the Hospital's

executive compensation plan − awarding a maximum of 9-18% of total salary as a bonus based solely on the financial performance of the Hospital – violates HUP.

In the Hospital's view, *Phoebe Services* is more germane, as it allowed under HUP an incentive pay plan in which 24% of an executive's total compensation derived from incentive bonuses and their overall salaries ranked in the 90th percentile of the market. The Hospital emphasizes that the court in *Phoebe Services* "expressly 'declined to hold that an entity must financially harm itself in order to negate a profit motive.'" *Id.* at 31 (quoting *Phoebe Services*, 262 A.3d at 271). The Hospital avers that this reasoning aligned with our holding in *Wilson Area School District, supra*, that non-profit organizations should not be penalized for attempting to maintain a positive bottom line, in recognition of the fact that such incentive plans were necessary for non-profits to be competitive and retain employees.

The Hospital maintains that furnishing reasonable and fair market compensation to its executives is not in furtherance of private profit, and, indeed, that reasonable compensation furthers, not detracts from, the entity's charitable purpose, as we recognized in *West Allegheny Hospital* and *Wilson Area School District*. The Hospital emphasizes that employee incentives paid by non-profit corporations are not like dividends or distributions of their for-profit counterparts; rather, they are "earned compensation in a highly competitive labor market," *id.* at 34, and are necessary if non-profit corporations are to fulfill their core mission.

The Hospital argues that the Commonwealth Court ignored substantial evidence, credited by the trial court and not refuted by the School District, which demonstrated that the Hospital's incentive compensation program is typical of programs offered by other

healthcare employers, and that the compensation did not exceed fair market value for the services rendered. Instead, according to the Hospital, the Commonwealth Court substituted its own view that the executive pay was excessive, which was not supported by the evidence.

Further, the Hospital characterizes the "substantial percentage" test as "unworkable in practice," *id.* at 37, contending it offers no guidance on how trial courts or tax assessment bodies can determine whether a particular incentive plan excessively ties bonus compensation to financial performance, and so invites the very sort of subjectivity that Article VIII, Section 2 was designed to avert.

The Hospital maintains that, if our Court affirms the Commonwealth Court's holding that its compensation plan is an improper "substantial percentage" because it awards a maximum bonus of 9-18% of executives' total income based on financial performance, local authorities will challenge every incentive plan offered by non-profit organizations, and thereby change the way non-profits recruit and pay their employees.

Moreover, in the Hospital's view, the Commonwealth Court did not understand its compensation plan, suggesting it erroneously misunderstood how the bonuses were calculated, given that it interpreted the overall percentage of their total compensation based on financial performance to be 40%, rather than 9%-18%, as the trial court determined. Thus, the Hospital asserts that the trial court properly considered this lower percentage figure when it held that such compensation was not substantial, and the Commonwealth Court's failure to appreciate this distinction, by itself, renders its conclusion unsound.

Finally, the Hospital posits that, if the Commonwealth Court's decision is left intact, few, if any, non-profit organizations will qualify for the charitable exemption because nearly all non-profits offer some kind of incentive compensation to attract and retain skilled and effective leaders. The Hospital submits that the resulting loss of this real estate tax exemption will undermine the incentive for non-profits to provide public services and will, correspondingly, force the government to compensate for their loss. Accordingly, the Hospital asks us to reverse the Commonwealth Court, and hold that entities like the Hospital may offer their leaders reasonable pay, including within-market incentive compensation, without sacrificing their tax-exempt status.[13]

---

[13] In its *amicus* brief filed in support of the Hospital, HAP asserts that over 80% of Pennsylvania healthcare non-profits have some sort of incentive-based compensation systems, and the Commonwealth Court's decision upended the law regarding when such entities can claim tax exempt status, leaving uncertainty regarding how to structure executive compensation. The decision suggests that, if hospitals want to offer incentive pay to executives to get the most qualified candidates, they must do so without basing the incentives on the financial performance of the institution. HAP asserts this is absurd in that it ignores marketplace realities, as hospitals do not want to give incentive bonuses to executives if the hospital is performing poorly or is in financial distress. It highlights that even Act 55, *see supra* note 5, requires only that the employee compensation not be "primarily" based upon the non-profit's financial performance. *See* 10 P.S. § 375(c)(3).

In its *amicus* brief, LVHN asks for a clear standard from this Court so that charities can confidently assess whether they are operating under the correct governing principles. It urges this Court to adopt the presumption of reasonableness of executive compensation as set forth in the "Intermediate Sanctions Regulations" promulgated by the Internal Revenue Service ("IRS") pursuant to Section 4958 of the Internal Revenue Code, which punishes individual executives of charitable organizations who engage in self-dealing by receiving excessive compensation, but does not penalize the organization itself. According to LVHN, these regulations create a presumption that executive compensation is reasonable whenever the tax exempt entity follows certain procedures in fixing the amount of that compensation, such as: ensuring it is approved by a body of the organization free of any conflict of interest; that the body making the determination relies on appropriate comparable data; and that it documents its rationale for making the final compensation award. LVHN Brief at 15-16. If these steps are not followed, then the IRS can impose a penalty upon the individual corporate executive in the form of a 25% tax on
(continued…)

The School District responds that the Commonwealth Court correctly analyzed the incentive compensation payable to the Hospital executives and found that providing bonuses which it calculates as amounting to 40% of the executives' salaries, based on certain economic performance thresholds wholly conditioned on the financial performance of Tower Health, constituted a private profit motive disqualifying the Hospital from exemption under the *HUP* test. The Hospital asserts that the total percentage of executive incentive compensation to the Hospital executives — nearly 20% of their total cash compensation — is within the range cited by the Commonwealth Court in *Dunwoody Village* as indicative of a private profit motive, *i.e.*, 18-24% of executive salaries. Indeed, the School District points out that *Dunwoody Village* found a private profit motive without even identifying the percentage of the executive bonus tied to financial performance. Thus, in the School District's view, these facts demonstrate that the Hospital's primary motive in implementing this executive compensation arrangement was to secure a financial profit, rendering it ineligible for the charitable tax exemption.

The School District argues that the trial court's ruling to the contrary improperly relied upon *Phoebe Services*, *supra*, where the incentive plan was not tied to financial performance. By contrast, it contends that, in this case, the Hospital, along with Tower

---

the amount of benefits paid (including compensation and ancillary benefits) as "excessive." *Id.*

LVHN maintains that adopting this presumption would provide a concrete, predictable standard by which charities could reliably satisfy their burden of proof under the *HUP* test, while also permitting taxing authorities to discredit or refute the presumption by presenting competent evidence to the contrary. LVHN points out that in this matter the School District did not present any evidence to refute the evidence presented by the Hospital that its executive compensation was reasonable, and, instead, focused upon the compensation paid to only a single executive, Tower Health's CEO, without any emphasis on the salary paid to the Hospital's CEO.

Health, tied their executive compensation directly to financial performance. Also, the School District avers that, unlike in *Phoebe Services*, the Hospital presented no evidence that the compensation scheme was necessary for the Hospital to obtain or retain executives. Thus, in the School District's view, the Commonwealth Court based its opinion on the record and did not err in denying the Hospital's exemption.

Further, the School District maintains that the Hospital's reliance on expert testimony to demonstrate that its compensation plan was "reasonable" is mistaken. School District Brief at 36. The School District declares that the Hospital's experts provided no evidence that its compensation plan resulted in the hiring of specific executives at the Hospital or Tower Health, or that it would have been impossible to hire such executives without such plan. Also, it claims the "reasonableness" testimony presented by the Hospital's experts concerned that term's use in IRS filings, which the School District submits does not require consideration of private profit motive. *Id.* at 39. Thus, in its view, the evidence failed to support the Hospital's stated justification for paying financially-based incentives.

Moreover, the School District points out that non-profits could, as a voluntary choice, elect to forego the tax savings provided by the charitable exemption and hire executives using incentives based only on financial performance, which it postulates could provide enough revenue to account for the taxes owed, while leaving a surplus to devote to its charitable mission. In this regard, the School District notes that the Hospital paid $1 million in real estate taxes, which was a fraction of its income. Thus, the School District submits that the loss of the real estate tax exemption would not mean the demise of all non-profits as the Hospital contends; rather, in the School District's view, the

Hospital and its boards of directors simply have an economic decision to make on how best to deliver charitable care, which may not include taking this deduction.

Finally, the School District proffers that the Hospital mischaracterizes the Commonwealth Court's "substantial percentage" language as having "manufactured a new rule." *Id.* at 42. It contends that the court used such language merely to set a threshold for gauging the evidence necessary to find that the Hospital lacked a profit motive. The School District avers that no bright-line test is necessary, given that it is well-recognized that a non-profit may have surplus revenue, so long as such revenue is not used to benefit an individual or a corporation, as occurred here. Accordingly, the School District asks us to affirm the Commonwealth Court on this issue.

## 2. Analysis

In the early aftermath of the addition of Article VIII, Section 2 to the Reform Constitution of 1874, the amount of compensation paid to a charitable hospital's management had no bearing on its application because, quite simply, charitable hospitals such as the aforementioned Pennsylvania Hospital paid their president and directors no salary, as was the norm of that era. *See* Bird, *supra*; History of Pennsylvania Hospital, *available at* https://www.uphs.upenn.edu/paharc/.

However, due to the changing nature and increasing complexity of charitable hospitals' role in the delivery of healthcare services to patients over the ensuing decades described above, they began to incorporate prevailing practices utilized by for-profit businesses, which included paying employees and managers involved in the operations of the hospitals, as it became increasingly necessary for them to do so in order to function.

Our law's treatment of charitable hospitals was likewise transformed by their embrace of traditional for-profit business practices, as eloquently described by Justice Michael Musmanno, speaking for our Court:

> To say that a person who pays for what he receives is still the object of charity is a self-contradiction in terms. In the early days of public accommodation for the ill and the maimed, charity was exercised in its pure and pristine sense. Many good men and women, liberal in purse and generous in soul, set up houses to heal the poor and homeless victims of disease and injury. They made no charge for this care. The benefactors felt themselves richly rewarded in the knowledge that they were befriending humanity. In that period of sociological history, the hospitals were havens mostly for the indigent. The wealthy and the so-called middle class were treated in their homes where usually there could be found better facilities than could be had in the hospitals. The hospital or infirmary was more often than not part of the village parish. Charity in the biblical sense prevailed.

> Whatever the law may have been regarding charitable institutions in the past, it does not meet the conditions of today. Charitable enterprises are no longer housed in ramshackly wooden structures. They are not mere storm shelters to succor the traveler and temporarily refuge those stricken in a common disaster. Hospitals today are growing into mighty edifices in brick, stone, glass and marble. Many of them maintain large staffs, they use the best equipment that science can devise, they utilize the most modern methods in devoting themselves to the noblest purpose of man, that of helping one's stricken brother. But they do all this on a business basis, submitting invoices for services rendered—and properly so.

> And if a hospital functions as a business institution, by charging and receiving money for what it offers, it must be a business establishment also in meeting obligations it incurs in running that establishment.

*Flagiello v. Pennsylvania Hospital*, 208 A.2d 193, 196-97 (Pa. 1965). Consequently, as charitable hospitals began to pay their executives, the question inevitably arose regarding

what level of compensation was permissible in order for the organization to continue to qualify as a purely public charity under Article VIII, Section 2.

Our Court first specifically opined in *West Allegheny Hospital* in 1982 as to the impact the payment of salaries to hospital executives would have on those institutions' status as purely public charities under Article VIII, Section 2. Therein, we implicitly recognized that, by that point, hospitals routinely paid their executives compensation, and did not regard that fact, in and of itself, as disqualifying them from a tax exemption. Notably, we upheld the hospital's entitlement to a charitable tax exemption in that case, because the record established that its administrators' work was "necessary to the functioning of [the hospital's] facilities and has been paid for at rates equal to or less than the rates paid by comparable institutions for comparable services." 455 A.2d at 1172. Consequently, with this decision, our Court incorporated into the constitutional test for a charitable tax exemption under Article VIII, Section 2, a requirement that such salaries be reasonable − *i.e.*, equal to or less than executive salaries of *comparable* institutions that provide *comparable* services − as a relevant factor in determining whether they operated free of a private profit motive.[14]

In support of this principle, and because a hospital which is a purely public charity functions as a trust for the benefit of all members of the public, our Court cited to Section 376 the Restatement (Second) of Trusts, which provides:

> *b. Incidental pecuniary benefit.* The mere fact that persons who are not objects of charity incidentally benefit from the maintenance of a charitable institution does not prevent the

---

[14] This was consistent with our Court's previous jurisprudence which used a similar standard of reasonableness in evaluating the salaries of management and employees of a private school to determine if it qualified as a purely public charity. *See In re Hill School*, 87 A.2d 259, 264 (Pa. 1952) (observing that "no one receives any profit or individual gain, the trustees serve without pay, the headmaster and teachers receive salaries *in line with those paid by similar schools, both public and private*" (internal quotation marks omitted and emphasis added)).

institution from being charitable. Thus, an institution for the promotion of charitable purposes is charitable although salaries are paid to its managers, officers and employees. If, however, the fixing of a salary is merely a device for securing the profits of the institution and not merely compensation for services rendered, the institution is not a charitable institution.

Restatement (Second) of Trusts § 376 (1959). Thus, our Court endorsed the principle set forth therein that a charitable hospital may pay its managers, but not to the degree that their compensation transforms into a device for securing profits.

Our Court's decision in *HUP*, rendered three years after *West Allegheny Hospital*, did not elaborate on how the reasonableness of executive salaries should be assessed, noting only, without comment, that the purported charitable entity which provided accounting and support services to hospitals paid its executives "compensation for their services." 487 A.2d at 1310.

However, subsequent to *HUP*, in *St. Margaret Seneca Place, supra*, we interpreted *West Allegheny* as establishing the principle "that payment of excessive salaries and fringe benefits to corporate officers might evidence a private profit motive." 640 A.2d at 385. We thus signaled that the question of the reasonableness of executive compensation and fringe benefits remained the most relevant consideration in evaluating the purely private profit motive prong of the HUP.

Finally, in *Wilson Area School District*, as discussed above, we admonished that, for purposes of the *HUP* test, no part of the revenue of the organization may "inure[], directly or indirectly, to any private individual related to the charitable entity." 747 A.2d at 880. We emphasized that the touchstone inquiry required by Article VIII, Section 2 to determine whether such forbidden private inurement occurred with respect to executive salaries was, again, whether the amount of such salaries was "reasonable." *Id.* at 881. Although we did not elaborate on the criteria for determining reasonable compensation, we observed that federal tax law governing non-profit corporations, while not controlling,

is nevertheless "instructive" in assessing when an organization is operating entirely free from a private profit motive for purposes of the *HUP* test. *Id.* at 880 n.7.

As noted by a leading authority in the area of non-profit taxation, courts of the modern era have now identified factors which should be considered in determining if executive compensation is reasonable for purposes of federal taxation, as they focus on whether an executive has excessively benefitted at the expense of the organization they lead. These factors are:

- the levels of compensation paid by similar organizations . . . for functionally comparable positions, with emphasis on comparable entities in the same community or region;

- the need of the organization for the services of the individual whose compensation is being evaluated;

- the individual's background, education, training, experience, and responsibilities;

- whether the compensation resulted from arm's-length bargaining, such as whether it was approved by an independent board of directors;

- the size and complexity of the organization, in terms of . . . assets, income, and number of employees;

- the individual's prior compensation arrangement;

- the individual's performance;

- the relationship of the individual's compensation to that paid to other employees of the same organization;

- whether there has been a sharp increase in the individual's compensation . . . from one year to the next; and

- the amount of time the individual devotes to the position.

Bruce R. Hopkins, *The Law of Tax Exempt Organizations* (11th ed. 2016) 558.

Given their similar focus on preventing impermissible private inurement, we conclude that these factors are likewise suitable for determining whether the compensation structure for an executive of an entity seeking a charitable tax exemption is reasonable under the *HUP* test. A court's evaluation of these factors will, by their nature, be fact-intensive, with particular weight given to considerations such as the type of charitable services provided by the entity to the community it serves, the geographic location in which it provides those services, and the particular skills, duties and competencies which will be required of the executive to fulfill the entity's core charitable mission.

Additionally, the degree to which the executive's compensation is dependent on the financial performance of the institution is a relevant part of this inquiry, given Article VIII, Section 2's command that the primary purpose of granting a tax exemption must be to fulfill a public purpose and not to enable an individual's personal pecuniary gain. As a general rule, then, the greater the percentage of an executive's total compensation which is based on financial performance, the more likely it will be that the executive compensation package as a whole is unreasonable. However, there is no fixed percentage of total executive compensation based on financial performance which will *ipso facto* render a particular compensation structure unreasonable. Rather, in situations such as presented in this case − where a percentage bonus of an executive's overall compensation package is based on the financial performance of the entity the executive heads − the question of whether the compensation is reasonable will depend on the total percentage of the executive's salary derived from financial performance which the bonus represents, when considered *in conjunction with* the above-enumerated factors.

While *Dunwoody Village* and *Phoebe Services* came to opposing conclusions on the issue of reasonableness of the executives' compensation at issue therein, based in part on the percentage of the executives' overall compensation directly tied to financial performance, neither case is dispositive of the ultimate issue in *this* case. Whether the Hospital's executives' compensation was unreasonable in the instant matter because of the bonus they received for the financial performance of the Pottstown hospital facility depended not only on the percentage of their total compensation the bonus represented, but also on the other relevant factors enumerated above which were involved in setting the amount of their overall compensation.

As described above, the trial court reviewed the entirety of the evidence it received on the issue of the reasonableness of the compensation of the Hospital's executives. Based thereon, the trial court found that the compensation package was determined by the Executive Compensation Committee of the Hospital in an arm's length manner as part of an annual review process, and that it had developed the incentive pay structure and base salary levels as part of an effort to retain its employees, a need they deemed to be particularly acute given the added responsibilities the employees would take on as the result of the acquisition of Pottstown Hospital by Tower Health. Trial Court Opinion, 2/23/22, at 7-8. The trial court further noted that the ultimate compensation package offered to the Hospital's employees was based on the analysis of its consulting firm comparing the salaries at other similar institutions, and on the firm's recommendations. *Id.* at 8.

The court also recounted the testimony at trial of Clifford Simmons, an expert in the field of compensation of healthcare executives. Simmons opined that, for fiscal years

2018 to 2020, even if the executives had received the maximum total compensation their bonus compensation package allowed, it would have been within fair market value. *Id.* at 9-10. Thus, Simmons testified that, because these executives received less than the maximum allowable compensation, their actual compensation was likewise within fair market value. Critically, as the trial court noted, the School District did not present an expert witness, nor did the trial court find any other evidence presented which rebutted this conclusion. *Id.* at 10.

Based on these findings, and our own review of the record, we conclude that substantial evidence was presented which showed that the percentage of the overall compensation of the Hospital's executives based on its financial performance, and their total compensation, was reasonable in light of the relevant factors which were employed in developing this compensation plan, including the fact that it was within fair market value as compared to similar executives at similar healthcare institutions. Consequently, we uphold the trial court's determination, challenged herein and reversed by the Commonwealth Court, that the Hospital met the fifth prong of the *HUP* test because it functioned free from private profit motive.

Accordingly, we reverse the order of the Commonwealth Court and reinstate the trial court's order upholding the tax exemption.

Order reversed. Jurisdiction relinquished.

Justices Dougherty, Wecht, Brobson and McCaffery join the opinion.

Justice Mundy files a dissenting opinion in which Justice Donohue joins.