In re: **Appeal of COMMUNITY GENERAL HOSPITAL from a Decision of the Board of Assessment Appeals of Berks County.**

**CITY OF READING and School District of the City of Reading.**

**Appeal of COMMUNITY GENERAL HOSPITAL, Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 17, 1996.

Decided Jan. 26, 1998.

Anthony E. Creato, Philadelphia, for appellant.

John W. Beatty, Erie, for appellees, City of Reading and the School District of the City of Reading.

Before COLINS, President Judge,
DOYLE, SMITH, FRIEDMAN, KELLEY and FLAHERTY, JJ.

DOYLE, Judge.

Community General Hospital (Community) appeals an order of the Court of Common Pleas of Berks County, which affirmed a decision of the Berks County Board of Assessment discontinuing the hospital's charitable exemption from the real estate tax.

## FACTUAL HISTORY

### History and Corporate Structure of Community

In 1888, a group of homeopathic physicians were operating a free dispensary in Reading, Pennsylvania. The physicians applied for a charter and a hospital was incorporated as the Homeopathic Medical and Surgical Hospital. The hospital's name was changed in 1943 to Community General Hospital.

On October 18, 1991, Community entered into an affiliation agreement with Graduate Health System (Graduate). Pursuant to the agreement, Graduate made a one time cash payment of $250,000, donated capital assets such as hospital equipment, and guaranteed financing, in return for becoming the owner of Community. The terms of the agreement also required Community to pay Graduate a yearly management fee, which, since 1992, has been $504,000 annually. Graduate has the power to select the members of Community's Board of Trustees and the power to remove them, with or without cause. An entity of Graduate pays the salary of Community's Chief Executive Officer.

Community does business with two entities affiliated with Graduate: Greater Atlantic Health Services (Greater Atlantic), a health maintenance organization; and GHS Technology Management, Inc. (GHS), a provider of clinical engineering services. Community became acquainted with Graduate's affiliates through its dealings with Graduate.

The corporations at issue here are depicted in the following organizational chart:

Graduate
(Parent Corp.)
Non-Profit

Community
Non-Profit

Greater
Atlantic
For-profit?

GHS
For-
profit?

### Charitable Services and Financial Status of Community

Community provides inpatient hospital care to individuals, many of whom are Medicare/Medicaid recipients or are uninsured. **In 1994, 76% of Community's average daily number of inpatients were covered by the Medicare/Medicaid programs.** Also, in 1994, 1.4% of its inpatients were uninsured. As a result of subsidizing care to patients covered by government programs and those who are uninsured, the Hospital experienced the following shortfalls (the shortfalls constitute Medicaid/Medicare subsidies, treatment for the uninsured or underinsured, and those who simply fail to pay): in 1991, $2,624,719; in 1992, $2,590,787; in 1993, $2,971,827; and in 1994, $3,971,469. Community does not sue patients who do not have the ability to pay outstanding medical bills; only once in seven years prior to the trial court's decision in this matter, did Community sue a patient for an unpaid bill.

Community, in addition to providing inpatient medical care in its hospital, maintains health clinics including a Dental clinic, Eye clinic, Emergency Care Unit, and a Community Health Center. All the aforementioned clinics provide services to the lowest socio-economic class in our society, and no person is turned away from those clinics because of an inability to pay for the services.

In 1994, Community's total expenses exceeded its total revenues by $68,773. During the years 1991 through 1993, however, revenues exceeded expenses, resulting in surpluses ranging from a low of $874,000 in 1993 to a high of $1,542,000 in 1991. Community used those excess revenues to maintain, repair and expand its facilities. In the future, Community must generate $13,193,000 to meet its capital replacement needs for the next three to five years.

The members of Community's Board of Trustees are not paid. In 1994, Community's CEO earned $150,000 in salary and a bonus; the same year, its CFO earned $97,000 in salary and a bonus. Community's executives are not given memberships in country clubs and Community does not use incentive plans geared to enhancing profits.

### Procedural History

Community's property, consisting of nine separate tax parcels, has been exempt from the real estate tax for the reason that Community was a charity. The City of Reading and the Reading School District (collectively referred to as Reading) appealed Community's tax exempt status to the Board and, by letter dated May 11, 1992, the Board notified Community that it was reviewing its tax exempt status. On August 27, 1992, after a hearing, the Board denied Community a con-

tinuation of its tax exempt status effective as of January 1, 1993.

Community appealed the Board's decision to the trial court. The trial court conducted hearings on December 6 and 7, 1994, and, thereafter, issued a decision affirming the Board's order and denying Community a charitable exemption from the real estate tax.

To determine whether Community was a purely public charity entitled to a tax exemption, the trial court applied the test in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (hereinafter *HUP*), wherein the Supreme Court identified the following five factors to be considered when determining whether a particular organization qualifies as a purely public charity:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317. In determining whether Community operated entirely free of the profit motive, the trial court examined the relationship between Community and all of its related corporate entities, utilizing the following analytical framework which it formulated:

We conclude that Entity A cannot be operated entirely free from a private profit motive if it:

(1) is owned and controlled by Entity B;

(2) does business with Entity B; or

(3) does business with Entity C when Entity C is owned or controlled by Entity B, unless Entity B and Entity C each devote all their income and profit to public charitable purposes.

An entity cannot own or control an organization which would otherwise be a public charity and use that organization to enhance its sales or increase its revenues, even if its charges are fair and reasonable and usual and customary in the area in which it does business and its profits are fair.

(Trial Court Opinion at 13.) (Emphasis added.)

The trial court concluded that, although Community satisfied the first four elements of the *HUP* test, it failed to prove that it operated entirely free of a profit motive. The trial court reached that conclusion because, applying the test it developed, Community failed to prove that Graduate and its other affiliated corporations were also charities and applied their earnings to charitable purposes. This appeal followed.

## ISSUE PRESENTED

Community contends that the trial court erred in holding that in order for Community to demonstrate that it operates entirely free of the profit motive, Community had to show that its parent corporation was itself a pure public charity and that the parent corporation's other subsidiary entities donated their income and profits to charity. Reading, in addition to countering the arguments of Community, also asserts in its brief that Community is appealing an interlocutory order.

## DISCUSSION

### Is the Order Appealed from Interlocutory?

Reading argues that Community is appealing from an interlocutory order. That argument is derived from a memorandum opinion issued by the trial court on September 8, 1995, which reasoned that the order sub judice was not final because:

In the present action, the hospital appealed from the Board's decision to discontinue the hospital's local real estate tax exempt status *and* from the County's valuation of the property owned by the hospital. The two issues were bifurcated and this Court heard evidence on the tax exempt status issue only. The issue of valuation has not been heard and remains undecided. Therefore, the Order of June 28, 1995, did not end the litigation or dispose of the entire case, and is interlocutory.

(Memorandum Opinion, 9/8/95, at 2.) (Emphasis in the original.)

■ To appeal to this Court as of right, a party generally must take an appeal from a final order as defined by Pa. R.A.P. 341(b).[1] A final order is an order that (1) disposes of all claims or all parties, (2) an order expressly defined by statute as final, or (3) an order that does not resolve all claims in a case, but which nevertheless expressly determines that an immediate appeal would facilitate resolution of the entire case. Pa. R.A.P. 341(b). Bifurcation refers to the authority of a trial court to regulate the order of proof in a case by severing the various issues raised and conducting separate trials on each issue, usually for judicial economy. *Swanger v. Pyles,* 204 Pa. Superior Ct. 72, 203 A.2d 488 (1964).

■ Our review of the record reveals that Community filed a "Petition of Appeal" on September 24, 1992, from the Board's order revoking its tax exempt status, which was docketed by the trial court at No. 5017–92. That petition does not raise any issue concerning the tax value of Community's property; the Board's order did not decide any issue regarding the tax value of Community's property. The valuation issue was raised, however, by Community in a separate real estate tax assessment appeal before the trial court.

Although the parties stipulated that the exemption issue would be tried first, and if the trial court found against Community, a trial would be conducted on the valuation issue, the proceedings here do not involve a situation where the issues in a single case were bifurcated for separate trials on each issue. Instead, the parties agreed to litigate the exemption case before they litigated the valuation case. Because the exemption issue was raised in a separate and distinct case and the trial court's decision resolved all claims raised in that case, we hold that the order sub judice is a final and appealable order.

1. There is a limited class of interlocutory orders which may be appealed as of right under Pa. R.A.P. 311, and collateral orders may be appealed as of right under Pa. R.A.P. 313.

## Is Community a Purely Public Charity Entitled to an Exemption From Real Estate Taxes?

Article 8, Section 2, of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. The General Assembly, based on that grant of authority, enacted Section 204 of the General County Assessment Law (Law),[2] granting a real estate tax exemption to purely public charities. In order to qualify as a public charity under Section 204 of the Law, the institution must satisfy the test articulated in *HUP.* The taxpayer bears the burden of proving that it is entitled to the exemption and must satisfy all five criteria of the *HUP* test to qualify as an institution of purely public charity. *Associated YM–YWHA of Greater New York/ Camp Poyntelle v. County of Wayne,* 149 Pa.Cmwlth. 349, 613 A.2d 125 (1992).

In addition, an applicant must satisfy Section 204(a)(3) of the Law, 72 P.S. § 5020–204(a)(3), which provides the following standard for tax exempt real property:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . . .

(3) All hospitals ... founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose.

The only element of the *HUP* test at issue in this appeal is whether Community operates entirely free of a profit motive. The trial court determined that Community satisfied all the other elements of the *HUP* test and, because none of the Appellees in this appeal dispute that Community has satisfied those elements or have filed a cross appeal challenging that determination, we will not revisit those issues.

2. Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204.

We must first determine whether the trial court erred in holding that the corporate siblings of Community must be pure public charities or devote their profits to charitable purposes.

■ This singular issue is the identical issue which was presented in *St. Joseph Hospital v. Berks County Board of Assessment Appeals,* 709 A.2d 928 (Pa.Cmwlth.1998), argued seriatim with this appeal, where we held, following the case precedent found in *Sacred Heart Healthcare System v. Commonwealth,* 673 A.2d 1021 (Pa.Cmwlth.1996), and *Appeal of Northwestern Corp.,* 665 A.2d 856 (Pa.Cmwlth.1995), that only the activities of the corporation applying for the charitable exemption will be considered in determining its eligibility for tax exempt status, although those activities might well include the diversion of excess revenues to sibling corporations. For all the same reasons which we articulated in *St. Joseph Hospital,* we conclude that Common Pleas erred when it held that Community General could not qualify for a charitable exemption because it failed to prove that its affiliated corporations were also charitable entities.

■ The trial court's reasons for denying the exemption, however, were not limited to Community's failure to prove that its related corporations were also charities. Graduate's control and ownership of Community was also a critical basis for the trial court's decision to require Community to prove that Graduate was also a charity. However, as we stated in *St. Joseph Hospital,* control of a parent corporation over a corporate subsidiary is relevant in a charitable tax exemption case *only* where, under the analysis utilized when determining whether to pierce the corporate veil, the parent's level of control is so great that the subsidiary is merely a sham corporation or, in other words, the alter ego of the parent. The trial court's conclusion that Community was controlled by Graduate

was based on its findings that Graduate was the owner of Community, had the power to elect and remove the members of Community's Board of Trustees, and paid the salary of Community's CEO. Critically, the trial court did not find that Community was a not a bona fide corporation, that Community had no independent decision making power, or that Community's corporate form was being used to perpetrate a fraud. Therefore, regardless of the fact that Graduate controls Community General Hospital, it is nevertheless a corporation distinct from Graduate and, hence, our holding in *Sacred Heart* is applicable here.

■ Viewing Community General as an independent entity, we conclude that the Hospital satisfied its burden of proving that it operates free of a private profit motive. In 1991, 1992, and 1993, Community realized an excess of revenues over expenses; Community's expenses exceeded its revenues in 1994. All surpluses realized by Community, however, have been reinvested back into the institution through the maintenance, repair and expansion of its facilities. In *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny,* 536 Pa. 478, 640 A.2d 380 (1994), our Supreme Court held that, where an institution realizes a surplus of funds and reapplies those monies to the maintenance of the facility, that surplus is not private profit. Therefore, following *St. Margaret Seneca Place,* Community's surpluses do not constitute "profit." Furthermore, there is no evidence that Community's officers are receiving profits through excessive salaries, nor does Community General provide its executives with expensive benefits such as memberships to country clubs, nor does it have an incentive program geared to enhancing profits.

Moreover, in contrast to *Harrisburg Hospital, Polyclinic Medical Center,* and *Hamot,*[3] there is here no evidence of vast transfers of revenue to Graduate or to any for-profit entities. Although Community pays

---

**3.** *Pinnacle Health Hospitals, Successor by Merger to Harrisburg Hospital v. Dauphin County Board of Assessment Appeals,* 708 A.2d 1284 (Pa. Cmwlth.1998); *Pinnacle Health Hospitals, Successor by Consolidation to Polyclinic Medical* *Center v. Dauphin County Board of Assessment Appeals,* 708 A.2d 845 (Pa.Cmwlth.1998); *School District of Erie v. Hamot Medical Center,* 144 Pa.Cmwlth. 668, 602 A.2d 407 (1992).

Graduate a hefty fee each year for management services, the consideration that Community receives from Graduate far exceeds the value of that payment. Community's payment to its corporate parent is for valuable management services, which improved the functioning of the hospital. Such a reciprocal arrangement is not the equivalent of transferring surplus revenues to a related entity that does not operate free of the profit motive. *See Lehighton Area School District v. Carbon County Board of Assessment,* 708 A.2d 1297 (Pa.Cmwlth.1998) (monies transferred by a hospital to a parent corporation for management services that increased the efficiency of the hospital did not preclude the grant of a tax exemption under Section 204 of the Law).

■ Further, the contracts between Community and the two subsidiary corporations of Graduate, *viz.,* Greater Atlantic and GHS, are also not evidence of a profit motive. It is not clear from the record whether Greater Atlantic and GHS are for-profit entities, but, regardless of their status, the record indicates that the contracts were for reasonable market rates and provided valuable services to Community. But for the connection to Graduate, the contracts at issue are indistinguishable from any other type of contract Community would normally execute. Obviously, it would be absurd to hold that an organization cannot qualify as a purely public charity unless it contracts only with other charitable organizations.

In light of the above, we hold that Community has satisfied every element of the *HUP* test and is a purely public charity.

### Is Community entitled to a tax exemption under Section 204 of the Law?

■ Although Community is a purely public charity under *HUP,* to qualify for an exemption from the real estate tax, it must nonetheless also satisfy the requirements of Section 204(a) of the Law. *The Couriers–Susquehanna, Inc. v. County of Dauphin,* 693 A.2d 626 (Pa.Cmwlth.1997) (*Couriers II* ). The party seeking such an exemption bears a heavy burden of proving that it is deserving of a tax exemption, *Appeal of Capital Extended Care,* 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992), and tax exemption statutes, like Section 204 of the Law, must be strictly construed. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1928(b)(5). While the trial court did not specifically consider Section 204 of the Law because of its conclusion that Community failed the *HUP* test, the record is nonetheless sufficient for us to address this issue and, accordingly, we need not remand this matter.

■ Section 204(a)(3) establishes three criterion for determining if a charity qualifies for a tax exemption: (1) the institution must be one of purely public charity; (2) it must have been founded by public or private charity; and (3) it must be maintained by public or private charity. *Woods Schools Tax Exemption Case,* 406 Pa. 579, 178 A.2d 600 (1962).

■ Generally, the most difficult issue to resolve in the *Woods* test is whether the organization is maintained by charity. In order to find that an institution is maintained by charity, the institution must show that it receives significant charitable contributions. *Couriers II.* However, an institution need not be completely funded by charitable contributions to be maintained by charity. *Mt. Macrina Manor, Inc. v. Fayette County Board of Assessment Appeals,* 683 A.2d 935 (Pa. Cmwlth.1996). So long as an institution is partially funded by charity and any surplus revenues which it receives are used to operate the facility or are placed in a surplus fund for future use, the institution is maintained by charity. *West Allegheny Hospital v. Board of Property Assessment, Appeals and Review of Allegheny County,* 500 Pa. 236, 455 A.2d 1170 (1982) (where an institution had revenues derived from patient billings and reinvested those funds in the charity's facilities, the institution was supported and maintained by public charity); *Mt. Macrina Manor.*

■ Applying the above principles to the instant case, we conclude that Community satisfies each element of the *Woods* test and qualifies for an exemption under Section 204 of the Law. Considering that it satisfied the *HUP* test, Community is deemed to be an

institution of purely public charity. It is also clear from the record that Community was founded in 1888 and expanded thereafter by a combination of public and private charity. (Community Exhibit 15; Reproduced Record (R.R.) at 263a–84a.) Furthermore, the trial court found as fact that Community reinvests all its surplus revenues back into maintenance, repair and expansion of its facilities. While the trial court did not make specific findings of fact on the amount of donations received by Community, there is undisputed evidence that Community receives substantial charitable contributions and receives valuable services from volunteers. From 1991–1994, contributions each year ranged from a low of $375,736 to a high of $453,606; the annual value of volunteer services for the same time period ranged from a low of $287,-920 to a high of $305,620. (Exhibits 3 and 4, R.R. at 247a–48a.)

Hence, we conclude that Community qualifies for a tax exemption under Section 204 of the Law.[4]

### CONCLUSION

For all the above reasons, we hold that Community is a purely public charity and is entitled to an exemption from local taxes, and, thus reverse the trial court's order.

### ORDER

NOW, January 26, 1998, the order of the Court of Common Pleas of Berks County in the above-captioned matter is hereby reversed.

PELLEGRINI, J., did not participate in the decision in this case.

---

**4.** Governor Tom Ridge recently signed into law the Institutions of Purely Public Charity Act (Act), Act of November 26, 1997, P.L. ——, No. 55, which has enacted extensive legislative changes under the provisions of Article 8, Section 2(a)(v) of the Constitution, which provides:
    (a) The General Assembly may by law exempt from taxation:

. . . .
   (v) Institutions of purely public charity. . . .
  Although Section 16 of the Act provides that its major provisions will take place immediately, they have no effect on the tax years at issue in this case.