# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lazarus Housing, LLC | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | |
| | : | |
| Allentown School District, | : | |
| Allentown City, Lehigh County | : | |
| Board of Assessment Appeals, | : | |
| Lehigh County Department of Law | : | |
| | : Nos. 992, 993, 994, 995 & | |
| Appeal of: City of Allentown and | : 1010 C.D. 2023 | |
| Lehigh County | : Argued: December 8, 2025 | |

BEFORE:     HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE STACY WALLACE, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                                          FILED: February 4, 2026

The City of Allentown (City) and Lehigh County (County) appeal the August 11, 2023 orders of the Court of Common Pleas of Lehigh County (trial court) reversing the decision of the Lehigh County Board of Assessment Appeals (Board). The trial court's orders granted an exemption from property taxation for Lazarus Housing, LLC (Lazarus) as a purely public charity. The City and County (collectively, Appellants) contend the trial court abused its discretion and erred as a matter of law in two main regards; firstly, by finding that Lazarus can include the

charitable services of a separate and independent corporation in its exemption petition; and secondly, by finding that Lazarus produced sufficient evidence under both the *Hospital Utilization Project* test and the Institutions of Purely Public Charity Act. We affirm.

## BACKGROUND

On November 25, 2020, Lazarus appealed the Board's October 30, 2020 decision which denied a real estate tax exemption for five separate parcels (Property).[1] Reproduced Record (R.R.) at 417-18.[2] Lazarus filed a separate appeal for each parcel, and on February 14, 2023, the trial court held a non-jury trial for all five parcels. *Id.* at 418. In five separate, identical August 11, 2023 orders and decisions, the trial court reversed the Board. *Id.* at 416-31. These matters are now consolidated on appeal.

On November 21, 2017, the Lehigh County Conference of Churches (Conference of Churches) created and organized Lazarus as a Domestic Limited Liability Company exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code of 1986.[3] *Id.* at 121, 419. Lazarus was created "to acquire and hold real property, and provide affordable housing through real property, and to facilitate the development of supportive relationships for adults re-entering the community, such as after incarceration, and reduce the risk of recidivism among participants." *Id.* at 108-09. The Conference of Churches uses the Property for its Lazarus Housing Program. *Id.* at 419. Both Lazarus and the Conference of Churches have their principal offices at 457 W. Allen Street, Allentown, Pennsylvania 18102.

---

[1] The five properties, all located in Allentown, Lehigh County, are as follows: 449 W. Allen Street; 451 W. Allen Street; 462 W. Tilghman Street; 609 S. 6th Street; and 614 N. Penn Street.
[2] References to Reproduced Record reflect electronic pagination relative to 992 C.D. 2023.
[3] 26 U.S.C. § 501(c)(3).

2

*Id.* at 107-08. Lazarus's Certificate of Organization and Operating Agreement both provide:

> Lazarus does not contemplate pecuniary gain or profit, incidental or otherwise. No part of the net earnings of Lazarus shall inure to the benefit of, or be distributable to Lazarus Directors or officers, or other private persons, except that Lazarus shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein. Notwithstanding the generality of the foregoing, whenever the lawful activities of Lazarus involve, among other things, the charging of fees or prices for services or production, Lazarus shall have the right to receive such income and, in so doing, may have net earnings. All such net earnings shall be applied to the operation and maintenance of the lawful activities of Lazarus.

*Id.* at 109, 354.

The Operating Agreement also delineates the powers of the Lazarus Board as "The persons designated pursuant to this [Operating] Agreement as the Lazarus Directors shall have all powers and duties for the conduct of the activities, business and affairs of Lazarus." *Id.* at 110. Moreover, the Operating Agreement provides:

> Lazarus Board manages all the business and affairs of Lazarus subject to the authority and direction of [the Conference of Churches]. Except for situations in which the approval of [the Conference of Churches] is expressly required by this Agreement or by no-waivable provisions of applicable law, and subject to the authority and direction of [the Conference of Churches] or [the Conference of Churches'] articles of incorporation, as amended, or bylaws, as amended, or any other restrictions on [the Conference of Churches], Lazarus Board has full and complete authority, power, and discretion to manage and control the business, affairs, assets and properties of Lazarus, to make all decisions regarding those matters, and to perform any and all other acts or activities customary incident to the management of Lazarus' business.

*Id.* The number of Lazarus Directors shall be no less than three, but no more than nine, and a minimum of two seats on the Lazarus Board must be held or reserved for the Conference of Churches Directors. *Id.*

The Conference of Churches is the sole member of Lazarus. *Id.* at 419. The Lazarus Board of Directors makes decisions subject to the authority and direction of the Conference of Churches. *Id.* at 110. Lazarus does not pay any fees or dividends to any incorporators, voting members, chief officers, executives or employees. *Id.* at 101. In the event of dissolution, after payment of all liabilities, the assets of Lazarus shall be transferred to the Conference of Churches or, if the Conference of Churches is dissolved, to one or more qualifying 501(c)(3) organizations or to a governmental entity described in Section 170 (c)(1) of the Code, but under no circumstance to any director, officer or employee of Lazarus or to the Conference of Churches. *Id.* at 119.

Pursuant to an Access, Use, License and Managed Services Agreement (Services Agreement), the Conference of Churches agrees to provide Lazarus with certain administrative, operational, management, financial, accounting, and human resource services. *Id.* at 101, 124-28. Under the Services Agreement, Lazarus contracts with the Conference of Churches for support, as Lazarus does not have its own employees. *Id.* at 101. Lazarus's financial reporting, including audits, is combined with the Conference of Churches; however, Lazarus does maintain separate financial records from the Conference of Churches. *Id.* at 56.

By orders of August 11, 2023, the trial court reversed the Board, concluding Lazarus is a purely public charity within the meaning of article VIII, section 2(a)(v) of the Pennsylvania Constitution. PA. CONST. art. 8, section 2(a)(v). The trial court first addressed the City's assertion that because Lazarus's parent, the Conference of

4

Churches, operates all charitable programming at the Property, Lazarus presented no evidence of providing any services to qualify for a purely public charity exemption. *Id.* at 419. The trial court likened the case to *Pottstown School District v. Montgomery County Board of Assessment Appeals*, 289 A.3d 1142 (Pa. Cmwlth. 2023) (*Pottstown I*),[4] wherein Tower Health, LLC (Tower Health), created a limited liability company (LLC) to run several newly purchased hospitals as nonprofit entities. *Id.* at 420. Tower Health was the sole member of each newly created LLC. *Id.* One of these entities, Pottstown Hospital, LLC, sought property tax exemption, which the trial court granted. *Id.* On appeal, the Commonwealth Court rejected the contention the trial court should have found Tower Health's degree of control over the Hospital's operations made Tower Health the true party in interest for tax exemption purposes. *Id.*

The trial court further relied upon *Pottstown I,* as it involved the LLC and its sole member, and distinguished cases involving a parent-subsidiary relationship, such as *Appeal of Community General Hospital*, 708 A.2d 124 (Pa. Cmwlth. 1998) and the case relied upon by the City, *Appeal of the Northwestern Corporation from the Dauphin County Board of Assessment Appeals*, 665 A.2d 856 (Pa. Cmwlth. 1995). *Id.* at 420-21. Relying upon the Nonprofit Corporation Law of 1988, and the limited liability company's operating agreement, the *Pottstown I* Court concluded the limited liability company was member-managed, rather than manager-managed. *Id.* at 421-22. The trial court adopted the same rationale of the *Pottstown I* Court, and reviewing Lazarus's Operating Agreement and its Access, Use, License and

---

[4] On May 30, 2025, the Supreme Court of Pennsylvania reversed the Commonwealth Court, *Pottstown School District v. Montgomery County Board of Assessment Appeals* (*Pottstown II*), 335 A.3d 1125 (Pa. 2025). Here, we directed the parties to file briefs relative to the implications, if any, of this change in the law. *See* Per Curiam Order of November 13, 2025.

Managed Services Agreement with the Conference of Churches, the trial court found no evidence of manager-management. *Id.* at 422. The trial court specifically determined Lazarus has one member, the Conference of Churches, and "the management of all business and affairs of Lazarus is subject to the authority and direction of the Conference of Churches." *Id.* Applying *Pottstown I*, the trial court held Lazarus is member-managed and assessed the totality of operations conducted at the Property in determining Lazarus's entitlement to exemption status. *Id.*

The trial court next held that Lazarus satisfied the five-part test established by our Supreme Court in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 487 A.2d 1306 (Pa. 1985) (*HUP*), as well as the statutory requirements of the Institutions of Purely Public Charity Act (Public Charity Act), 10 P.S. §§ 371-385.[5] R.R. at 423. To qualify as a purely public charity under *HUP*, an entity must possess the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*HUP* at 1317. An institution advances a charitable purpose "if it benefits the public from an educational, religious, moral, physical or social standpoint." *City of Washington v. Bd. of Assessment Appeals*, 704 A.2d 120, 122-23 (Pa. 1997).

The trial court based this conclusion on a number of factual findings, premised primarily upon review of Lazarus's internal documents and the testimony proffered

---

[5] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§ 371-385.

by the sole trial witness, Shawn Milisits (Milisits), Director of Finance for Lazarus and the Conference of Churches. The trial court determined the Lazarus program benefits the public in a variety of ways by providing housing "for those who are poor, have mental health issues, suffer from addiction, or are re-entering the population from prison," and at a time when providing housing may be critical. R.R. at 423. The court found that Lazarus "actively provide[s] low-cost housing to members of society who are in very vulnerable positions and help them to become productive members of society," and "promotes restoration and new life for those who need it most." *Id.* The trial court deemed providing persons with a second chance a charitable purpose. *Id.* at 424.

The trial court determined that although rent for each apartment is $500 per month, "rent actually depends upon what the prospective client can afford." *Id.* Rent includes electricity, gas, water, sewer and trash, full furnishings, renter's insurance, and a waiver of move-in fee. *Id.* With no testimony or evidence to the contrary, the trial court found the rental value of $500 well under market value. *Id.* The trial court also deemed credible testimony that 94% of the accounts receivable are for rents past due, and that Lazarus does not enforce an eviction policy. *Id.*

The trial court reiterated Lazarus "serves the poor, and those who have mental health issues, suffer from addiction, or are re-entering the population from prison." R.R. 424. By serving people who "are in need of help to get back on their feet," such as indigent tenants and those who seek to reenter society after going through the criminal justice system, and facilitating the "development of supportive relationships," the trial court concluded the program benefited a substantial and indefinite class of persons who are the legitimate subjects of charity. *Id.*

7

Based on Milisits' testimony, the trial court found "without this program, the people receiving support from this program who are in need of charity would have to seek housing assistance from the government," and that "Lazarus has worked with a few people to get them some rental assistance." *Id.* at 425. The trial court noted Commonwealth funding is "for capital expenditures to repair the properties." *Id.* The trial court found "[t]he reduced burden to the government is legitimately equated to the rent charged below market price," since Lazarus provides affordable housing without government assistance. *Id.*

As to the last prong of *HUP*, operation free from private profit motive, the trial court characterized this prong as "coming under great scrutiny in the Commonwealth in recent times." *Id.* The court outlined the case of *Pottstown I* where the Commonwealth Court reversed the trial court and held that the "eye popping" executive salaries, in conjunction with tying 40 percent of the bonus incentives to the hospital's financial performance, indicated a private profit motive. *Id.* at 425-26. The trial court considered the financial statements for the Conference of Churches for 2017, 2018, 2019 and 2020, and testimony that prior to 2023, Lazarus "was bringing in more money than it was spending." *Id.* at 426. The trial court also viewed the amended financial reports, solely accounting for Lazarus and not the Conference of Churches, which the witness testified as showing Lazarus operated "$20,000 in the red." *Id.*

The trial court relied upon *Pottstown I,* to formulate its analysis, first noting that "surplus revenue is not synonymous with private profit." *Id.* As in *Pottstown I,* the trial court focused on the following three factors relative to the use of revenue, specifically:

> 1) Whether the utilization of the revenue is made with the expectation of a reasonable return or some non-monetary benefit;

8

2) Whether the utilization of the revenue ultimately supports or furthers the eleemosynary nature of the charitable entity; and

3) Whether the utilization of the revenue inures, directly or indirectly, to any private individual related to the charitable entity or related organization.

*Id.* (citation omitted). The trial court examined the Operating Agreement and the Certificate of Organization for Lazarus and rejected the notion that either document supported a private profit motive. *Id.* at 427. Based on the testimony and financial statements, the court found the salaries "modest and reasonable as opposed to eye popping," given that at the end of the year, profit is kept within Lazarus to repair the properties, and hopefully expand the program, without a profit motive. *Id.*

Having satisfied the *HUP* test, the trial court next examined whether Lazarus also established the statutory requirements of the Public Charity Act, which provides:

§ 375. Criteria for institutions of purely public charity

(a) **General rule.**—An institution of purely public charity is an institution which meets the criteria set forth in subsections (b), (c), (d), (e) and (f). An institution which meets the criteria specified in this section shall be considered to be founded, endowed and maintained by public or private charity.

(b) **Charitable purpose.**—The institution must advance a charitable purpose.

***

(c) **Private profit motive**.—The institution must operate entirely free from private profit motive.

***

(d) **Community service.**—
   (1) The institution must donate or render gratuitously a substantial portion of its services.
   ***

(e) **Charity to persons.**—

9

(1) The institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity.

\*\*\*

(f) **Government service.**—The institution must relieve the government of some of its burden.

\*\*\*

*Id.* at 427-28 (quoting 10 P.S. § 375(a)-(f)). The trial court focused upon the private profit motive prong, noting the following specifications:

(1) Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals, as the private inurement standard is interpreted under section 501(c)(3) of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 501(c)(3)).

(2) The institution applies or reserves all revenue, including contributions, in excess of expenses in furtherance of its charitable purpose or to funding of other institutions which meet the provisions of this subsection and subsection (b).

(3) Compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution.

(4) The governing body of the institution of purely public charity has adopted as part of its articles of incorporation or, if unincorporated, other governing legal documents a provision that expressly prohibits the use of any surplus funds for private inurement to any person in the event of a sale or dissolution of the institution of purely public charity.

*Id.* at 429-430 (quoting 10 P.S. § 375(c)). Relying upon its *HUP* analysis, the trial court also examined Lazarus's Operating Agreement for protocol in the event of sale and dissolution. *Id.* at 430. Based upon the preclusion in article XII, that "[u]under no circumstances shall any assets be distributed to Lazarus Directors or [the Conference of Churches]," the trial court held Lazarus satisfied the private profit motive prong. *Id.*

10

The trial court found Lazarus satisfied the community service prong "by the fact that everyone receives the benefit of wholly gratuitous goods and services provided, such as: electricity, gas, water, sewer, trash, fully furnished apartments, renter's insurance, and a waiver of the move-in fee." *Id.* The trial court held Lazarus met the charity to persons prong based upon the testimony of record that Lazarus provides "for people who otherwise would not be able to fully provide for themselves." *Id.* The trial court ruled Lazarus met the government service prong based upon the wide "panoply of services that Lazarus offers," that "the government has historically assumed or offered for individuals who seek government housing assistance programs or funding for housing." *Id.* at 431. The trial court concluded Lazarus satisfied the requirements of the Public Charity Act. *Id.* Overall, the trial court recognized Lazarus as a purely public charity. *Id.*

The City and County appealed to this Court.

## DISCUSSION

This Court's review determines whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by substantial evidence. *Walnut-Twelve Assocs. v. Bd. of Assessment of Revision of Taxes of City of Phila.*, 570 A.2d 619, 622 (Pa. Cmwlth. 1990). The trial court, as fact finder, has discretion over evidentiary weight and credibility determinations. *1198 Butler Street Assocs. v. Bd. of Assessment Appeals, Cnty. of Northampton*, 946 A.2d 1131, 1138 n.7 (Pa. Cmwlth. 2008). Generally, Appellants contend the trial court abused its discretion and erred as a matter of law in determining Lazarus qualifies for a real estate tax exemption as an institution of purely public charity. R.R. at 442. Appellants also assert the trial court abused its discretion and erred as a matter of law in failing to issue relevant findings of fact (*Id.* at 444); failing to render

11

conclusions of law supported by applicable facts (*Id.*); misapplying the burden of proof (*Id.* at 444-45); and "disregarding relevant precedent of the Supreme and Commonwealth Courts, including, but not limited to, the Commonwealth Court's Opinions in *Friends Boarding Home of Western Quarterly Meeting v. Commonwealth*, 260 A.2d 1064 (Pa. Cmwlth. 2021), *exceptions denied*, 285 A.3d 339 (Pa. Cmwlth. 2022), relied on heavily by the County and the City." (*Id.* at 445). We address these contentions along with Appellants' more detailed assertions below:

I. **Inclusion of All Charitable Activities by the Conference of Churches in Lazarus's Exemption Petition**

Appellants contend the trial court abused its discretion and erred as a matter of law in concluding the operations at Lazarus's properties by Lazarus's separately incorporated parent company should be included in the calculation of Lazarus's charitable operations for real estate tax exemption purposes. R.R. 442-43. Appellants criticize the trial court's reliance upon *Pottstown I* to support its conclusion that a "'member-managed' LLC with a single member is simply the alter ego of a parent corporation and can therefore include the charitable activities of the parent for consideration of their exemption petition." *Id.* at 443. Appellants suggest that "[t]his conclusion is the opposite of the Commonwealth Court's holding in *Pottstown* [*I*], where the Commonwealth Court held the member-managed hospital was in fact a separate entity from the managing corporation, Tower Health; stating that there was '. . . no authority to support the proposition that a member's management of an LLC pursuant to statute would entitle an opposing party in litigation to pierce the corporate veil of the LLC solely by reason of such management.'" *Id.* (quoting *Pottstown I, supra,* at 1149). Appellants advocate that in *Pottstown I*, "the Commonwealth Court held that for the purposes of a charitable

12

real estate tax exemption, the fact that an entity is controlled by a single member was insufficient reason to pierce the corporate veil, and therefore the single member-managed corporation, and not the corporation that serves as manager, was the true party in interest." *Id.*

Guided by *Pottstown I*, 289 A.2d at 1148, the trial court considered the Nonprofit Corporation Law of 1988, 15 Pa.C.S. § 8847(a) and (b), the Lazarus Operating Agreement, and the Access, Use, License and Managed Services Agreement between Lazarus and the Conference of Churches. R.R. at 422. The trial court determined Lazarus is a member-managed LLC, as its Operating Agreement "does not illuminate any provision expressly providing that Lazarus is or will be manager-managed, managed by managers, vesting management with managers or any words of similar import," and as it has one member, the Conference of Churches. *Id.* Accordingly, the trial court found the charitable activities of both Lazarus and the Conference of Churches should be considered for tax exemption purposes.

During the pendency of this appeal, the Supreme Court disagreed with the Commonwealth Court's inclusion of a parent corporation's activities in instances of single member-managed LLCs. In *Pottstown II*, the Supreme Court held that for purposes of the *HUP* test, courts must only consider the acts of the individual entity seeking exemption unless grounds exist to pierce its corporate veil. 335 A.3d at 1144. Such evidence includes gross undercapitalization, failure to adhere to corporate formalities, substantial intermingling of personal and corporate affairs, use of corporate form to perpetuate fraud, or where a parent dominates the non-profit corporation to the degree that it can be rendered a sham corporation or mere alter ego of the parent. *Id.* (citation omitted). The Supreme Court found that Tower Health and Hospital maintained their independent corporate identities, and the

13

excessive salaries and management fees, in the absence of any additional facts, were insufficient to pierce the corporate veil. In turn, the activities of the parent company, Tower Health, could not be attributed to the member-managed subsidiary for exemption purposes. *Id.* at 1145. The Supreme Court ultimately reversed the Commonwealth Court and reinstated the trial court's order granting tax exemption.

Appellants argue that nothing in the record meets any of the factors necessary to pierce the corporate veil, and thus, following *Pottstown II*, only Lazarus's activities can be used to determine if Lazarus qualifies as an institution of purely public charity. City's Supp. Br. at 12-13. Lazarus agrees that *Pottstown I* no longer supports the proposition that the acts of the Conference of Churches should be considered solely because Lazarus is member-managed. Lazarus's Supp. Br. at 9. Lazarus also asserts that insufficient evidence exists to pierce the corporate veil. *Id.* Additionally, Lazarus distinguishes *Pottstown II*, which focuses on the compensation of Tower Health's executives. *Id.* However, Lazarus contends that consideration may still be given to the Conference of Churches' charitable acts, as Lazarus has a Services Agreement with the Conference of Churches, wherein it directs the Conference of Churches to provide services and programs to Lazarus tenants. *Id.*

A comprehensive review of the record reveals that no parties challenged the independent corporate structure of Lazarus and it is not something we should analyze *sua sponte*.

Though the trial court initially indicated that it would "assess the totality of the operations conducted at the Property," (R.R. at 422) a careful reading of the opinion reveals that the trial court ultimately focused primarily on the activities of Lazarus. Because this focus is precisely in accordance with *Pottstown II*, we will

14

affirm the trial court's analyses of *HUP* and the Public Charity Act on other grounds. Additionally, we give credence to Lazarus's contention that the Services Agreement between Lazarus and the Conference of Churches also can factor into a *HUP* analysis. Thus, we conclude that the trial court's determination is supported by substantial evidence.

## II. Purely Public Charity Under *HUP* Test

Appellants assert the trial court abused its discretion and erred as a matter of law as to prongs two and three of the *Hospital Utilization Project* test. R.R. at 443-44. Regarding the second prong, i.e., that it donates or renders gratuitously a substantial portion of its services, Appellants contend "the undisputed evidence demonstrated that [Lazarus] does not provide any uncompensated goods or services and does [not] provide any direct financial aid or reduced rent options to tenants; among other things, [Lazarus] presented no evidence that the $500 per unit rent it charges, which equates to $1,500 to $2,500 per home it owns was lower than the market rent charged by for-profit landlords in the City of Allentown." R.R. at 443. Regarding the third prong, i.e., that it benefits a substantial and indefinite class of persons who are legitimate subjects of charity, Appellants assert that Lazarus "only provides services to individuals who can afford monthly rent from their personal funds." *Id.*

The Pennsylvania Constitution addresses real estate exemptions for charitable institutions. Article VIII, section 2(a) states in pertinent part, as follows:

(a) The General Assembly may by law exempt from taxation:

. . . .

(v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is

15

actually and regularly used for the purposes of the institution.

PA. CONST. art. VIII, § 2(a)(v). The Pennsylvania Constitution does not define an "institution of purely public charity;" however, in *Hospital Utilization Project v. Commonwealth of Pennsylvania*, our Supreme Court promulgated the *HUP* test to fill this void. As mentioned before, under the *HUP* test, a purely public charity is an institution that:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317. The taxpayer bears the burden of establishing each of these elements. *In re Coatesville Area Sch. Dist.*, 280 A.3d 1152, 1159 (Pa. Cmwlth. 2022). Whether an entity qualifies as a "purely public charity" under the *HUP* test "is a mixed question of law and fact . . . ." *Id.*

In 1997, the General Assembly enacted the Public Charity Act to "weigh[] in on questions affecting determinations of charitable exemption[.]" *Alliance Home of Carlisle, PA v. Bd. of Assessment Appeals*, 919 A.2d 206, 216 (Pa. 2007). The Public Charity Act tracks the five criteria set forth in the *HUP* test and specifies the type of evidence needed to meet each individual criterion. The Public Charity Act codifies "the purely public charity test of *HUP*" and expounds thereon. *Church of the Overcomer v. Delaware Cnty. Bd. of Assessment Appeals*, 18 A.3d 386, 392 n.4 (Pa. Cmwlth. 2011). The *HUP* test sets forth the minimum constitutional requirements for a tax exemption. Therefore, the taxpayer seeking an exemption must "establish

16

that it is a 'purely public charity' under article VIII, section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Alliance Home of Carlisle*, 919 A.2d at 222. Under Section 5(a) of the Public Charity Act, an institution of purely public charity must meet all of the following criteria: (1) the institution must advance a charitable purpose; (2) the institution must operate entirely free from private profit motive; (3) the institution must donate or render gratuitously a substantial portion of its services; (4) the institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity; and (5) the institution must relieve the government of some of its burden. 10 P.S. § 375(5)(a).

The trial court found Lazarus satisfied all five prongs of the *HUP* test. As to prong two, a purely public charity donates or renders gratuitously a substantial portion of services by providing such services without regard to an individual's ability to pay. *HUP*, 487 A.2d at 1317. The trial court found that while each apartment lists for $500 per month, rent depends upon what the prospective client can afford. R.R. at 424. Rent includes "utilities of electricity, gas, water, sewer and trash, as well as a fully furnished apartment, renter's insurance, and, and this time, a waiver of a move-in fee." *Id.* With no testimony or evidence to rebut or refute the items encompassed in the $500 monthly rate, the trial court found the rental amount well under market value. *Id.* The trial court also deemed credible testimony of Milisits that 94 percent of the accounts receivable consist of rents over sixty days past due, and Lazarus does not enforce an eviction policy. *Id.* The record also supports Lazarus provides snow shoveling, lawn care and maintenance of common areas free of charge. R.R. at 74-75.

Procedurally, Appellants contend the trial court improperly shifted the heavy burden to the City and County to show that Lazarus's rate of $500 is lower than comparable for-profit rentals. City Br. at 35. The trial court referenced the Appellants' failure to refute or rebut the monthly rental fee. R.R. at 424. Here, the record reveals that the trial court carefully considered the evidence. We do not believe that acknowledgment of Appellants' lack of evidence constitutes a shifting of the burden of proof. Thus, we find no error. Alternatively, we note that "[m]isapplication of the burden of proof constitutes harmless error when the burdened party presents evidence such that it does not lose summarily and the fact-finder decides the case on evidence presented by both sides." *In re: Petition for Attorney Ridgebury Twp. Auditors*, 965 A.2d 314, 318 n.6 (Pa. Cmwlth. 2009). Any error in this regard is harmless, as the trial court clearly acknowledged that the party seeking the tax exemption bears the burden of proving entitlement thereto. *Id.* at 423. Again, we emphasize the trial court's careful examination of the evidence presented in reaching its decision. Accordingly, there is no merit to this contention.

Substantively, Appellants assert that Milisits was "unable to provide any evidence of comparable properties," and criticize Lazarus's failure to present expert testimony. City's Br. at 34-35. However, Appellants fail to cite authority that expert testimony is required. In fact, Milisits testified he regularly performs research as to comparable properties. R.R. at 70-71. "[A]n owner of land is competent to testify as to the value of his property." *Dep't of Transp. of Right-of-Way for State Route 00700, Section 21H, in the Borough of Bentleyville v. Bentleyville Garden Inn, Inc.*, 264 A.3d 415, 419 (Pa. Cmwlth. 2021). As the representative of Lazarus, Milisits can testify as to the Property rental value; no expert qualification is required. As the sole witness at trial, the trial court found Milisits' testimony credible. This

18

testimony, along with the entire record contains substantial evidence to support the trial court's findings that Lazarus donates or gratuitously renders a substantial portion of the services at the Property. The trial court did not abuse its discretion by finding that Lazarus established the second prong of the *HUP* test.

Appellants suggest that *Friends Boarding Home of Western Quarterly Meeting v. Commonwealth*, 260 A.3d 1064 (Pa. Cmwlth. 2021) provides guidance as to the second prong of *HUP*, and that the trial court erred as a matter of law in disregarding same. City's Br. at 37. In *Friends*, this Court applied the *HUP* test and denied a federally subsidized housing facility for the elderly a real estate tax exemption, finding that it failed to establish that it donated a substantial portion of its services. *Friends*, 260 A.3d at 1074. The *Friends* Court determined that the facility charged fees comparable to for-profit competitors; did not accept Medicaid; could decline admission or request a resident to leave in the event of inability to pay; and only provided financial assistance to a small portion of residents. *Id.* Appellants contend that Lazarus provides less overall assistance than *Friends*, as Lazarus does not provide health care or financial aid, and only admits those who can afford to pay rent, noting Lazarus's eviction of at least five tenants from its Property. City Br. at 40.

The trial court found rent to be not only well under market value but also determined by what the tenant could afford. R.R. at 424. The trial court likewise found that Lazarus does not enforce an eviction policy. *Id.* The trial court cited to *Friends* for certain legal tenets but found it factually distinguishable. *Id.* at 428. These findings are supported by substantial evidence. The trial court did not abuse its discretion by finding that Lazarus established the second prong of the *HUP* test.

19

Appellants next challenge the third prong of *HUP*, alleging that the trial court erred in finding that Lazarus benefits a substantial and indefinite class of persons who are legitimate subjects of charity. R.R. 443. "Legitimate subjects of charity are those who are unable to provide for themselves what the organization provides . . . ." *Mars Area Sch. Dist. v. United Presbyterian Women's Assoc. of N. Am.*, 693 A.2d 1002, 1007 (Pa. Cmwlth. 1997) (citation omitted). Appellants again rely on *Friends, supra,* in support of their position. City's Br. at 48.

The trial court found that "Lazarus serves the poor, and those who have mental health issues, suffer from addiction, or are re-entering the population from prison," all of whom "are in need of help to get back on their feet." R.R. at 424. The court also determined that Lazarus "provides benefits to people who are vulnerable to recidivism and allows such people to more easily transition into productive society," which "facilitates the development of supportive relationships." *Id.* Overall, the trial court could "draw no other conclusion than that this program offered at the Property benefits a substantial and indefinite class of persons who are the legitimate subjects of charity." *Id.* Additionally, the court found that Lazarus adjusts rent based upon a tenant's ability to pay. *Id.* These holdings are supported by substantial evidence. Unlike *Friends,* the trial court here determined that a tenant may rent even in the event of financial shortcoming. *Id.* We see no error in this regard.

### III. Purely Public Charity Under the Public Charity Act

Finally, Appellants assert the trial court abused its discretion and erred as a matter of law in concluding Lazarus produced evidence that it donated or rendered gratuitously a substantial portion of its services to satisfy the community service prong of the Public Charity Act, Section 375(d). R.R. 443-44. Appellants criticize

20

the trial court's failure to specifically address all prongs within the community service prong, as Appellants contend that Lazarus did not produce evidence that Lazarus:

(1) [has] a written and published policy identifying goods or services that are available to all who seek them without their ability to pay;

(2) [has] a written policy or written schedule of fees based on individual or family income;

(3) [provides] wholly gratuitous goods or services to at least 5% of those receiving similar goods or services from the institution;

(4) [provides] any financial assistance or uncompensated goods or services; or

(5) [provides] uncompensated goods or services which in the aggregate are equal to or at least 5% of the institution's cost of providing goods or services.

*Id*.

In its overall analysis of the Public Charity Act, the trial court reiterated its *HUP* findings, and carefully scrutinized Lazarus's plan in the event of sale or dissolution. R.R. at 429-30. Because the Operating Agreement prohibits distribution of assets to Lazarus Directors or the Conference of Churches, the trial court found Lazarus had satisfied the private profit prong. *Id.* at 430. The trial court found Lazarus satisfied the community service prong as tenants received electricity, gas, water, sewer, trash, fully furnished apartments, renter's insurance, and a move-in fee waiver. *Id.* Testimony that Lazarus provided for persons who would not otherwise fully provide for themselves established the charity to persons prong. *Id.* The trial court found that the government services prong was established given that

21

Lazarus provided housing for individuals who typically sought government housing or funding for housing. *Id.* at 431.

To satisfy the community service prong of the Public Charity Act, an institution need only fulfill one of the seven enumerated methods to prove entitlement to a tax exemption. *In re RHA Pa. Nursing Homes Health & Rehab. Residence*, 747 A.2d 1257, 1261 (Pa. Cmwlth. 2000). One such method, found in Section 5(d)(1)(iv) of the Act, states the institution must provide:

> Financial assistance or uncompensated goods and services to at least 20% of those receiving similar goods or services from the institution if at least 10% of the individuals receiving goods or services from the institution either paid no fees or fees which were 90% or less of the cost of the goods or services provided to them, after consideration of any financial assistance provided to them by the institution.

*Id.* (quotation omitted). In *In re RHA*, we affirmed the trial court's determination that the provision of inexpensive housing is an uncompensated good or service, sufficient to satisfy the community service prong. *In re RHA*, 747 A.2d at 1261-62.

Here, the City concedes that Lazarus's inexpensive housing could constitute an uncompensated good or service for analysis under the community service prong. City's Br. at 46. This is precisely what the trial court found. Specifically, the trial court determined Lazarus satisfied the community service prong because tenants received electricity, gas, water, sewer, trash, fully furnished apartments, renter's insurance, and a move-in fee waiver. R.R. at 430. Thus, because all Lazarus tenants paid less than the full cost of goods and services provided to them, it is sufficient to establish that Lazarus donated or gratuitously rendered a substantial portion of its services, as required for Lazarus to satisfy the community service prong. *See In re RHA*, at 1261-62. We discern no error by the trial court.

22

## CONCLUSION

Based on the above, we conclude that Lazarus produced substantial evidence under both the *HUP* test and the Public Charity Act to qualify as a purely public charity for tax exemption purposes. Accordingly, we affirm the trial court.

_____
STACY WALLACE, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Lazarus Housing, LLC | : **CASES CONSOLIDATED** |
| | : |
| v. | : |
| | : |
| Allentown School District, | : |
| Allentown City, Lehigh County | : |
| Board of Assessment Appeals, | : |
| Lehigh County Department of Law | : |
| | : Nos. 992, 993, 994, 995 & |
| Appeal of: City of Allentown and | : 1010 C.D. 2023 |
| Lehigh County | : |

# **O R D E R**

**AND NOW**, this 4th day of February 2026, the August 11, 2023 orders of the Court of Common Pleas of Lehigh County in the above-captioned matters are hereby **AFFIRMED**.

_____
STACY WALLACE, Judge